**CITIZENS FOR REID STATE PARK, an unincorporated association of Maine citizens, et al., Plaintiffs,**

v.

**Melvin LAIRD, Secretary of Defense, et al., Defendants.**

**Civ. No. 13–18.**

United States District Court, D. Maine, S. D.

Jan. 21, 1972.

Hugh Calkins, and R. John Westhoff, Portland, Me., for plaintiffs.

Peter Mills, U. S. Atty., John B. Wlodkowski, Asst. U. S. Atty., Portland, Me., Edward R. Fink, Alexandria, Va., for defendants.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Plaintiffs in this action seek to enjoin the United States Department of the Navy and Marine Corps from carrying out "Operation Snowy Beach," a mock amphibious landing on the beaches of Reid State Park in Georgetown, Maine, scheduled to take place on January 22–26, 1972, as part of a combined sea, air and amphibious training maneuver. In their amended complaint, plaintiffs allege that the operation poses the threat of serious potential ecological damage to the park. They seek to enjoin the Navy and Marine Corps from proceeding with the operation until the requirements of the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. § 4321 et seq.), Executive Order 11514 (35 F.R. 4247), the guidelines of the Council on Environmental Quality (36 F.R. 7724), and the Department of Defense Guidelines on Environmental Statements (36 F.R. 15750) are met. They allege that defendants have violated the policy and procedures set forth in NEPA and the cited Executive Order and guidelines.

Plaintiff Citizens for Reid State Park is a private unincorporated association of Maine citizens and residents interested in protecting the natural environment of Reid State Park. Plaintiff Environmental Defense Fund, Inc. is a non-profit corporation dedicated to protection and conservation of the environment and natural resources of the United States. The individual plaintiffs are Maine citizens who live in the area served by Reid State Park. Defendants are the Secretary of Defense, Secretary of the Navy, and Commandant of the Marine Corps. It is conceded that the Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331(a) and 5 U.S.C. §§ 701–706 and defendants do not contest that plaintiffs meet the requirements for standing recently set forth by the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).[1]

With the agreement of the parties, the trial of the action on the merits has been advanced and consolidated with the hearing of plaintiffs' application for a temporary restraining order and a preliminary injunction, Fed.R.Civ.P. 65(a) (2). An evidentiary hearing was had on January 19 and 20, 1972, all parties being represented. The essential facts are not disputed.

### Reid State Park

Reid State Park is located on the Maine coast in Georgetown, Maine. It has approximately one and one-half miles of shoreline and contains approximately 800 acres, consisting of sand beach, sand dunes, two salt marshes and wooded uplands. The beach is bounded by rocky headlands. The sand dunes adjoin the beach and are reasonably well covered by

1. *See* Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); *but see* Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), cert. granted sub nom., Sierra Club v. Morton, 401 U.S. 907, 91 S.Ct. 870, 27 L.Ed.2d 805 (1971).

dune grass (*Ammophillia sp.*). One salt marsh extends inland from the dunes; the second runs along a small river constituting the park's southern boundary. The marshes are composed primarily of salt marsh grasses (*Spartina S. alterniflora* and *S. patens*). The wooded uplands comprise the bulk of the interior of the park. They are covered by a typical Maine coastal growth of pitch pine, spruce and some hardwoods, interspersed with rocky outcroppings covered by lichens (*Cladonia spp.*) and mosses.

The park is owned by the State of Maine and is operated and maintained by the Maine State Department of Parks and Recreation (prior to January 1, 1972, the Maine State Park and Recreation Commission). The Department maintains roads and various other facilities in the park for the convenience of the public. Of present significance are the principal road leading from the main entrance at the northerly extremity of the park to the Griffith Head parking lot at the northerly end of the beach and the Todd's Point parking lot at the southerly end of the beach. These parking areas have a maximum capacity of approximately 800 vehicles. All areas of the park are open to the public. On a normal summer weekend, as many as 6,000 persons visit the park in one day. During the winter months, the park is essentially closed to the public.

### Operation Snowy Beach

That part of Operation Snowy Beach which relates to Reid State Park will consist of the landing of approximately 900 marines, who will bivouac in the wooded upland interior of the park over a three or four-day period and engage in cold weather training exercises. There are three alternate plans for the landing: (1) Under the preferred plan, an artillery battery, with four to six 105 mm. howitzers, and one rifle company, in seven amphibious tractors, will land on the beach at Todd's Point and will proceed on the existing access road to the Todd's Point parking area, a distance of less than 200 yards. The artillery battery will remain at Todd's Point. The rifle company will travel on foot along a wooded ridge to the bivouac area. A second rifle company will land by helicopter in a field at the park entrance, and a third rifle company will land by helicopter in a field near the center of the park. All personnel will then proceed on foot to the bivouac area. (2) If weather conditions preclude helicopter landings, all three rifle companies will land on the beach, in ten amphibious tractors, at either Todd's Point or Griffith Head, will proceed over the existing access roads the short distance to the respective parking areas, and thence will travel by foot over existing roads and ridges to the bivouac area. (3) If weather conditions preclude a beach landing, all personnel will land by helicopter in the designated landing areas.

In the bivouac area, the troops will set up company encampments and sleep in pup tents. They will be fed C rations and one hot meal daily, which will be flown in by helicopter from their ships. There will be no cooking except for heating C rations over heat tabs. In their training exercises, the troops will be restricted to the upland wooded areas and existing park roads.

At the conclusion of the exercise, the troops will embark along the same routes by which they landed.

In accordance with the terms of the permit issued by the Maine State Park and Recreation Commission, as supplemented by a written and oral agreement between the Commission and the Navy, the operation will be conducted subject to the following conditions: (1) all motor vehicles will be restricted to existing roadways; (2) with the exception of the designated landing and embarkation areas at Todd's Point, and if necessary at Griffith Head, the beaches, the sand dunes and the salt marshes will not be used by vehicles, helicopters or personnel; (3) helicopters will land only in designated landing areas at the Todd's Point and Griffith Head parking lots, in the field at the park entrance and in the field near the center of the park; (4)

helicopters will descend and ascend vertically; (5) portable chemical toilets will be used by all personnel; (6) no trees will be cut; (7) no live ammunition will be used; (8) there will be no littering of the park area, which is to be left in the same condition, as near as possible, as it is at the commencement of the exercise.

### Potential Environmental Damage

So far as the record discloses, if the conditions of the exercise are met, the only potential environmental damage, either ecological or aesthetic, to the park is: (1) that which may result from personnel walking over rocky outcroppings in the wooded upland area of the park and thereby tearing loose portions of the covering mat of lichens and mosses, and (2) that which could result from the "blowing out" of dune grass by the wash from the helicopter propellers if in landing or taking off from the parking areas they should fly too low over a dune.

### NEPA and Implementing Guidelines

NEPA, which became effective January 1, 1970, was a major step forward in the effort of the federal government to insure that man can continue to live in harmony with his environment. It requires all federal agencies to consider environmental values in their spheres of operation, and it prescribes certain procedures to be followed to insure that such values are in fact fully respected. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1111 (D.C. Cir. 1971). Section 101(a) of the Act, 42 U.S.C. § 4331(a), sets forth the Act's basic substantive policy by declaring that it is the "continuing policy of the Federal Government" to "use all practicable means and measures" to protect environmental values. Section 101(b), 42 U.S.C. § 4331(b), asserts the "continuing responsibility of the Federal Government to use all practicable means, consistent with other essential conditions of national policy," to avoid degradation of the environment, to preserve "historical, cultural and natural" resources, and to attain "the widest range of beneficial uses of the environment without . . . undesirable and unintended consequences."

Section 102, 42 U.S.C. § 4332, contains the procedural provisions of the Act. In essence, Section 102 requires every federal agency "to the fullest extent possible" to consider ecological factors, and to minimize adverse environmental effects, before undertaking any activity which may have an impact on man's environment.[2] Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, supra at 1112–1113; Zabel v. Tabb, 430 F.2d 199, 211 (5th Cir. 1970), cert. denied 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Of particular significance to the present action is Section 102(2) (C), which directs that, "to the fullest extent possible" all federal agencies shall include a detailed environmental impact statement in every recommendation or report on proposals for legislation and "other major Federal actions significantly affecting the quality of the human environment."

In "furtherance of the purpose and policy" of the Act, the President issued Executive Order No. 11514, 35 F.R. 4247, on March 5, 1970. That Order, among other things, directed federal agencies to "initiate measures needed to direct their policies, plans and programs so as to meet national environmental goals," and instructed the Council on Environmental Quality (CEQ), created by the Act, to issue guidelines to federal agencies for the preparation of environmental impact statements required by Section 102(2) (C). Pursuant to this mandate, CEQ on April 23, 1971 issued a set of guidelines (CEQ Guidelines), 36 F.R. 7724, for preparing statements on proposed federal actions affecting the environment. These

---

**2.** Because of its importance to this litigation, the full text of Section 102 is set forth as an Appendix to this opinion.

guidelines directed each federal agency to make a detailed assessment of the potential environmental effects of any proposed action by the agency and to establish, in consultation with CEQ, its own formal procedures for identifying those agency actions "significantly affecting the quality of the human environment," as to which environmental impact statements must be filed.[3]

Pursuant to the CEQ guidelines, the Department of Defense (DOD) on August 9, 1971 issued DOD Directive 6050.1, "Environmental Considerations in Department of Defense Actions," (DOD Guidelines), 36 F.R. 15750.[4] The DOD Guidelines require all DOD components to assess the environmental consequences of any proposed action "at the earliest practicable stage in the planning process" and in any event prior to decision. If it is determined that an action will not significantly affect the environment, no written assessment or Section 102(2) (C) environmental impact statement need be filed. If it is determined that a proposed action "may significantly affect the quality of the human environment or may be highly controversial with regard to environmental impact," a written assessment and a Section 102(2) (C) environmental impact statement must be prepared and processed in conformity with detailed requirements specified in the guidelines. The guidelines further require all DOD components to establish implementing procedures.[5]

On November 10, 1971 the Chief of Naval Operations issued OPNAV Instructions 6240.2B (Navy Guidelines) implementing the DOD directive. These Navy guidelines substantively vary little from the DOD guidelines. The Navy guidelines require, from "the inception of an action," a continuing assessment of its "probable ecological and environmental impacts." "For actions which obviously have no significant environmental impact or are not highly controversial, this [assessment] need not be written," and the preparation of an environmental impact statement is not required. Only if an action will significantly affect the quality of the human environment, must steps be taken beyond the assessment.[6]

3. The CEQ guidelines further provided: The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated). Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. Proposed actions, the environmental impact of which is apt to be highly controversial, should be covered in all cases. 36 F.R. 7724.

4. Prior to August 9, 1971, interim DOD guidelines on environmental impact statements, issued August 6, 1970, were in effect. So far as the present record discloses, the interim guidelines did not differ from the current guidelines in any presently material respect.

5. The DOD guidelines attempt to add some definition to the statutory phrase "major federal actions significantly affecting the quality of the human environment": DOD components shall insure that a decision is not made until the environmental consequences of the decision have been assessed. If the assessment indicates that the decision will either affect the environment on a large geographical scale or have a serious environmental effect in a more restricted geographical area, the proposed action shall be considered a Major Action Significantly Affecting the Quality of the Human Environment. . . . It is necessary to consider not only the degree of the effect on the environment but also the scope of the action and the potential effect of the action on other persons.

\* \* \* \* \*

For example, a limited maneuver or training exercise by small elements of a military department might not be a major action nor would it normally affect the environment significantly.

\* \* \* \* \*

The proponent of the action should consider all aspects of the action to determine if it will interfere unreasonably with the living conditions of man, wildlife, or marine life, or with any ecosystems on an immediate, short-range or long-range basis. 36 F.R. 15752.

6. Enclosure (1) to OPNAV Instruction 6240.2B provides "General Guides for

■ In summary, NEPA and its implementing agency guidelines require all federal agencies to incorporate as an integral part of their planning process consideration of the environmental consequences of any proposed action, and whenever such consideration indicates that the action may significantly affect the quality of the human environment to prepare and file a detailed environmental impact statement pursuant to Section 102(2) (C) of the Act.

### Naval Assessment of Operation Snowy Beach

No section 102(2) (C) environmental impact statement has been prepared or filed by the Navy with respect to Operation Snowy Beach. The record conclusively establishes, however, that, from the inception of the planning phase of the operation in the spring of 1971 to date, the Coordinator of the Environmental Quality Program in the office of the Commander-in-Chief, Atlantic Fleet, has been engrossed in a continuing assessment of the environmental consequences of the proposed action. This continuing assessment included personal inspections of the exercise area and consultation with the Maine State Park and Recreation Commission, State of Maine Fish and Wildlife agencies, the U. S. Army Corps of Engineers, the Federal Aviation Administration, and other public officials. It further involved consideration of the scope and character of the operation; any possible destruction of flora and fauna, as well as animals and their habitats; the topography of the park; the conditions fixed by the State of Maine and the additional restrictions to be imposed by the Navy; any possible damage to the beach at the landing and embarkation points; any possibility of park damage from vehicular traffic or the planned bivouac and training exercises; any possible impact on local fishing interests; any increase in local noise levels;

any possible depreciation of aesthetic values; any possible damage to ecosystems; and any possible alternatives to the proposed operation. As a result of this assessment, it was determined that the total environmental impact of the operation would be slight; that there were no unavoidable long-term adverse effects; that the only unavoidable short-term adverse effects would be a minor increase in local noise levels and in human waste and sewage; and that since Reid State Park offered the only area on the Eastern seaboard appropriate for a realistic cold-weather landing and training exercise, the only alternative was cancellation of the operation. The conclusion was that Operation Snowy Beach would not significantly affect the quality of the human environment at Reid State Park and that therefore no Section 102(2) (C) environmental impact statement was required.

### Conclusion

■■ As the foregoing summary of the evidence and the applicable law discloses, plaintiffs in this action have wholly failed to sustain their burden of establishing that in the planning of Operation Snowy Beach the Navy has not complied with the procedural requirements of Sections 102(1), 102(2) (A), (B) and (D) of NEPA, or of the implementing CEQ, DOD and Navy guidelines. Nor have plaintiffs made even a colorable showing that Operation Snowy Beach is a major federal action "significantly affecting the quality of the human environment" within the meaning of Section 102(2) (C) of the Act, so that the filing of an environmental impact statement was required.

■ There can be little doubt that NEPA is a clear mandate to all federal agencies to give careful and informed consideration to environmental values in their decisionmaking process. Calvert Cliffs' Coordinating Committee, Inc. v.

Determining Significance" and lists a number of factors to be considered in the evaluation of an action. These include the geographical extent of the ac-

tion, the time span, the risk potential, and any decrease in "the quality of life" which may result from, among other things, "the destruction of vegetation or wildlife."

United States Atomic Energy Commission, *supra;* Zabel v. Tabb, *supra;* Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 324 F.Supp. 878, 881 (D.D.C. 1971). The evidence presented has shown a wide-ranging and continuing assessment by the Navy of the potential environmental impact of the contemplated operation. Full good faith compliance with the substantive and procedural requirements of the Act has been shown. Furthermore, NEPA requires the filing of an environmental impact statement only in connection with proposals for legislation or "other major federal actions significantly affecting the quality of the human environment." Section 102(2) (C). Plaintiffs here seek judicial review of the Navy's determination that no such significant effect would be occasioned by Operation Snowy Beach. The Act plainly commits this preliminary determination to the agency. The statutory language "significantly affecting the quality of the human environment" is extremely broad and not susceptible of precise definition. The standard of review in such cases is limited; for in the language of the Supreme Court:

> Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the (agency's) decision "has 'warrant in the record' and a reasonable basis in law." Atlantic Refining Co. v. FTC, 381 U.S. 357, 367, 85 S.Ct. 1498, 1505, 14 L.Ed. 2d 443 (1965), citing National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

The record clearly warrants the Navy's determination that any potential environmental damage to Reid State Park from Operation Snowy Beach would be insignificant. Nor is there any basis for plaintiffs' suggestion that the decision was arbitrary or reached without adequate consideration of environmental factors. *Cf.* Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, *supra,* 449 F.2d at 1115.

Plaintiffs' motion for a temporary restraining order and a preliminary injunction is denied. Plaintiffs' prayer for a permanent injunction, a writ of mandamus or other order in the nature of mandamus, and a declaratory judgment is denied. Judgment will be entered dismissing the action with prejudice and with costs.

It is so ordered.

## APPENDIX

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Qaulity established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter.

42 U.S.C. § 4332.