**CITIZEN ADVOCATES FOR RESPONSIBLE EXPANSION, INC. ("I–CARE"), et al**

v.

**Elizabeth DOLE, as Secretary of the United States Department of Transportation, et al.**

**Civ. A. No. 4–83–210–K.**

United States District Court, N.D. Texas, Fort Worth Division.

Feb. 22, 1984.

Arnold & Porter by Scott H. Lang, Washington, D.C., David Bonderman, Fort Worth, Tex., for plaintiffs.

Stanley S. Harris, U.S. Atty. by Judith Bartnoff, Asst. U.S. Atty., Washington, D.C., Federal Highway Admin., DOT by Jean G. Rogers and James O. Price, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION

BELEW, District Judge.

In this action, I–CARE (Citizen Advocates for Responsible Expansion, Inc.) and other Plaintiffs, have joined together seeking declaratory and injunctive relief in an effort to have the Defendants reconsider and redesign portions of two proposed federally funded highway projects in Fort Worth, Texas, as now approved by the Secretary of the Department of Transportation. I–CARE is a non-profit corporation comprised of individuals, businesses, civic organizations, and labor unions.

Besides I–CARE, National Trust for Historic Preservation in the United States ("National Trust"), Ruth Carter Stevenson, Edmund Bowen Frost, Robert Hildreth Frost, Harold Jefferson Frost and George Marcus Frost are also Plaintiffs.

Defendants are Elizabeth Dole, Secretary of the United States Department of Transportation ("DOT"); Ray Barnhart, Administrator of the Federal Highway Administration ("FHWA"); and Mark G. Goode, Engineer-Director of the State of Texas Department of Highways and Public Transportation ("SDHPT").

### Jurisdiction

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (1976) (Federal Question), 28 U.S.C. § 1361 (1976) (Mandamus), 28 U.S.C. §§ 2201–2202 (1976) (Declaratory Judgment), and 5 U.S.C. §§ 701–706 (1982) (Administrative Procedure Act). Venue is proper pursuant to 28 U.S.C. § 1391(e) (1976).

### Background

Interstate 30 (I–30) is an east-west interstate highway that runs through the City of Fort Worth, Texas, and intersects with Interstate 35W (I–35W), a north-south interstate highway, at the southeast corner of the Fort Worth Central Business District ("CBD"). Construction of this I–30/I–35W interchange, popularly known as the "Mixmaster" began in 1956, before the National Interstate Highway System came into existence, and was completed in 1958. The west increment to and from the Mixmaster was built in four stages between 1958 and 1960. The fourth stage, now designated as part of I–30, is the focus of this lawsuit. It is located on an elevated structure ("the Overhead") that cuts through the southern edge of the CBD providing four lanes of roadway, two eastbound and two westbound.

Construction of the Overhead began in March, 1959, and was completed in April, 1960. It was built with Federal Interstate funds and is approximately .9 miles long with an eastern terminus near the intersection of Commerce Street and Lancaster Avenue and a western terminus near the intersection of Lamar Street and Lancaster Avenue.

The two federally funded highway projects subject to this lawsuit have been designated the "I–30 Project" and the "I–35W Project." The I–30 Project, as presently proposed and approved by Defendants, consists of expanding roughly six

miles of I-30 between Interstate 820 on the west and Summit Avenue on the east.[1] It will cost approximately $100 million in 1981 dollars and will be funded, in substantial part, with 90 percent federal funds under the "4-R" program for resurfacing, restoration, rehabilitation, and reconstruction of interstate highways, 23 U.S.C. § 103, 104. Defendants have prepared and circulated for public and interagency comment a Draft and Final Environmental Impact Statement ("E.I.S.") describing the environmental impacts of and alternatives to the I-30 Project.

The I-35W Project involves expansion from four to eight lanes of approximately eight miles of I-35W from Spur 280, the north increment of the Mixmaster interchange, to Highland Terrace, the south increment of the I-35W/I-30 interchange.

The I-35W Project also expands more than two miles of I-30 from Riverside Drive, the east increment of the Mixmaster interchange, to Summit Avenue, the west increment of the Mixmaster interchange. Thus, Summit Avenue is both the eastern terminus of the I-30 Project and the western terminus of the west leg of the I-35W Project. Since the Overhead lies east of Summit Avenue, its expansion is considered part of the I-35 *Project*, notwithstanding the fact that it is part of I-30.

The I-35W Project is estimated to cost approximately $251 million in 1981 dollars and has been approved for funding with 90 percent Federal Aid Interstate ("FAI") construction funds. Defendants processed the I-35W Project with a Negative Environmental Declaration concluding that the project, including the expansion of the Overhead, would not have significant impacts on the quality of the surrounding human environment.

1. Summit Avenue is a north-south street that crosses I-30 approximately one-half mile west of Overhead.

2. Ironically, the original design proposed by the state in the 1950's called for this stretch of highway to be depressed beneath the ground rather than elevated above it. However, in response to pressure applied by local business-

At this time, the Plaintiffs have asked the Court to enjoin both the I-35W Project north of Rosedale and the I-30 Project east of University Drive. The Plaintiffs' objective is to prevent the planned expansion of the Overhead so that certain alternatives to the planned expansion of the Overhead can be considered. In essence, the Plaintiffs want the Overhead torn down and replaced with a "depressed" or "below grade" highway.[2] As grounds for the injunctive and declaratory relief sought, Plaintiffs have alleged that Defendants failed to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.* (NEPA), Section 4(f) of the Transportation Act of 1966, 49 U.S.C. § 1653(f);[3] the public hearing and notice requirements of the Federal-Aid Highway Act, 23 U.S.C. § 128; and the Federal Highway Administration (FHWA) noise abatement regulations, 23 C.F.R., Part 772.

## THE NATIONAL ENVIRONMENT POLICY ACT of 1969 ("NEPA"), 42 U.S.C. § 4321, et seq.

Plaintiffs have alleged two violations of NEPA. In Count I of their five count amended complaint, they alleged that the Defendants violated NEPA by processing the I-35 Project with a Negative Declaration rather than an Environmental Impact Statement ("EIS"). In Count II they alleged that the Defendants violated NEPA by "segmenting" the I-30 Project and thereby rendering the I-30 Project's EIS inadequate.

■ The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, provides that federal agencies must prepare an environmental impact statement for every "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). All parties concede and this Court agrees that the

men, the state altered their original plans and built the present Overhead. The Plaintiffs now wish to have this stretch depressed as originally planned.

3. This section has recently been recodified at 49 U.S.C. § 303.

I–35W Project is a "major federal action" within the meaning of the statute. This Court's task, then, is to review the federal and state Defendants' initial determination that the I–35W Project will not significantly affect the quality of the human environment.

■ In the Fifth Circuit, administrative decisions to issue a Negative Declaration rather than an EIS are reviewed under a "reasonableness" standard. *Sierra Club v. Hassell,* 636 F.2d 1095, 1097 (5th Cir. 1981).

"A reviewing court is to review the administrative records as well as other evidence to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agencies engaged in this analysis and reasonably concluded on the basis of their findings that an impact statement was not required, their determinations will be upheld."

*Id.* at 1097–98.

■ In reviewing the Defendants' determination that an environmental impact statement was not required, this Court must not substitute its own views for those of the federal and state agencies since "it is not the province of the court to review the agency decision on the merits as to the desirability *vel non* of the project." *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 425 (5th Cir.1973).

■ Neither may this Court engage in hindsight in assessing the reasonableness of the agency decision, but must judge on the basis of the information that was before the agency at the time the decision was made. *Vermont Yankee Nuclear Power Corp. v. NRCP,* 435 U.S. 519, 547, 554–55, 98 S.Ct. 1197, 1213, 1217, 55 L.Ed.2d 460 (1978).

Applying these principles to this case, the Court concludes that the Defendants did not act unreasonably in processing the I–35W Project with a Negative Declaration.

Examples given in the regulations of actions which ordinarily have a significant effect on the quality of the human environment and which, thereby, suggest that an EIS is appropriate are:

(1) An action that has more than minimal effect on properties protected under section 4(f) of the DOT Act or Section 106 of the Historic Preservation Act.

(2) An action that is likely to be highly controversial on environmental grounds or with respect to the availability of adequate relocation housing.

(3) An action that is likely to have a significantly adverse impact on natural, ecological, cultural or scenic resources of national, State or local significance.

(4) An action that (i) causes significant division or disruption of an established community or disrupts orderly, planned development, or is determined to be significantly inconsistent with plans or goals that have been adopted by the community in which the project is located, as determined by a responsible official(s); or (ii) causes a significant increase in traffic congestion.

(5) An action which (i) is determined to be inconsistent with any Federal, State or local law or regulation relating to the environment, or (ii) has a significant determinable impact on air or water quality or on ambient noise levels for adjoining areas; or (iii) may contaminate a public water supply system" 23 C.F.R. § 771.-10(e) (1979).

At the time the decision was made to proceed with a negative declaration, the Defendants reasonably concluded that the I–35W Project appeared to fit none of the cited regulatory criteria.

Properties adjacent to the present Overhead which were, by the time of trial, protected under Section 4(f) of the DOT Act or Section 106 of the Historic Preservation Act are the Water Garden, the U.S. Post Office, the Texas & Pacific railroad station

terminals, and the Public Market.[4] However, in March of 1978, when the decision was made to process the I–35W Project with a Negative Declaration, the Texas & Pacific terminals were not yet on the National Register of Historic Places and the Post Office and Public Market had not yet been determined to be eligible for inclusion in the Register.

Although the T & P terminals were added to the National Register of Historic Places on May 26, 1978, there is little in either the administrative record or in the evidence adduced at trial to indicate that the Defendants were unreasonable in concluding that these buildings would suffer no more than minimal impacts from the proposed expansion. It was not until July of 1979, after the Negative Declaration had been approved, that the Defendants first learned the Advisory Council on Historic Preservation was concerned that expanding the Overhead might effect the T & P buildings and the Post Office, which was possibly eligible for inclusion in the National Register.

In response, the State commenced an on-site historical-archaeological survey of the proposed project and prepared a Section 4(f) Report and a Section 106 Report. Subsequently, the Federal Highway Administration agreed to alter portions of the project to minimize impacts on the historic buildings.[5] As modified, the I–35W Project will have no more than minimal impact on the historic buildings.

Although there has never been any doubt that the Water Garden is protected under Section 4(f), it was planned and constructed long after the Overhead was completed. More importantly, it was designed to be visually and acoustically shielded from the existing and proposed expanded Overhead. The administrative record supports a conclusion that the I–35W Project will have no more than minimal impact on the Water Garden.

Although there is no dispute, at least now, that expansion of the I–30 Overhead is opposed, the term "controversial," within the meaning of 23 C.F.R. § 771.10(e), *supra*, does not necessarily apply to a project simply because it is opposed. "The expression 'controversial' relates to situations where a *substantial* dispute exists as to the environmental effects of the proposed action and not merely to opposition to the intended use of the project." *Texas Committee on National Resources v. Bergland*, 433 F.Supp. 1235, 1248 (E.D.Tex. 1977).

> "To require an impact statement whenever a threshold determination dispensing with one is likely to face a court challenge would surrender the determination to opponents of a federal action, no matter whether major or not, nor how insignificant its environmental effect might be. *Hanly v. Kleindienst*, 471 F.2d 823, 830 (2nd Cir.1972). See *Citizens for Reid State Park v. Laird*, 336 F.Supp. 783 (D.Me.1972)."

*Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973).

Moreover, the issue before this Court is whether the project was reasonably considered unlikely to be highly "controver-

---

4. Each of these buildings was recognized as Historical because of its architectural features and not because of some historical event that occurred at the site. The T & P railroad station (the lobby which has a beautiful decor) has been closed to the public, except for an occasional private social event, since 1967. The Post Office is to be closed in the near future as a new postal facility is being built. Few Fort Worthians ever knew of the Public Market. It was shortlived and for over forty years it has been used by private businesses that do not cater to routine shoppers. The T & P warehouse is a building consisting of at least twelve floors and covers two city blocks. There is little, if any,

reason for the general public to enter or use this building. Each of the buildings was built during the 1930s.

5. Subsequent alterations to the project to minimize impacts on the historic buildings have included eliminating a ramp at Henderson Street and further modifying the project to avoid the taking of the Public Market and to preserve access to the property, and dropping a lane from and cantilevering a section of I–30 to move it farther away from the Post Office and Texas & Pacific buildings so as to reduce visual impacts.

sial" as to environmental effects when the decision was made to process the project with a Negative Declaration. The administrative record and trial testimony show that there was neither significant opposition to nor controversy of any sort surrounding the project until 1980, *after* the approval of the Negative Declaration.

■ The Court holds that the opposition now surrounding the proposed expanded Overhead is neither the type of controversy contemplated by 23 C.F.R. § 771.10(e) nor was the decision that the I–35W Project was unlikely to be highly controversial within the meaning of the regulations an unreasonable one.

As stated earlier, the Overhead has been in existence for more than two decades. Most of the proposed expansion will be accomplished within the existing right-of-way and adequate relocation housing will be available for displacees. The State's environmental assessment, submitted to the FHWA on March 22, 1978, recited that, since the proposed improvement concerned an *existing* facility in an urban environment, it was not expected to disrupt community cohesion, or cause significantly detrimental impacts on air, noise, or water quality. The administrative record thereby indicates that the Defendants reasonably decided that the I–35W Project was unlikely to have significant adverse impacts on natural, ecological, cultural, or scenic resources.

Similarly, expansion of the already existent Overhead will divide the surrounding community or, disrupt orderly, planned development less than would construction of a new overhead where there was none before.

"Absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored. For instance one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless park."

*Hanly v. Kleindienst,* 471 F.2d 823, 831 (2nd Cir.1972).

Plaintiffs have not shown, either through the administrative record or through evidence adduced at trial, that the Defendants were unreasonable in concluding that the I–35W Project would not cause significant division or disruption in the community, would not disrupt orderly, planned development, and would not create a previously non-existent physical or psychological barrier to the Southside.

There was conflicting expert testimony on the effect an expanded overhead will have on ambient noise levels for adjoining areas. Noise studies for the project show that the proposed expanded overhead will, in fact, increase ambient noise levels for adjoining areas but not by more than 3dBA. Based on the expert testimony, the Court finds that such an increase is generally not perceptible by the human ear and is not "significant" within the meaning of NEPA.

■ When the Defendants' decision was made to process the I–35W Project with a Negative Declaration, there was no reason to suppose significant environmental impacts would flow from the proposed action. Subsequent studies along with the planned mitigative measures have confirmed that initial assessment. Accordingly, the agency decisions made in this regard were reasonable and are upheld by the Court.

Plaintiffs have alleged in Count II of their Amended Complaint that "[f]or purposes of environmental review, Defendants arbitrarily and capriciously have segmented the single, integrated plan to expand I–30 in Fort Worth from the I–35W/I–30 Interchange to Interstate 820, treating the planned expansion of the Elevated I–30 Segment separately from the remainder of I–30 west of Summit Avenue."

The gist of the Plaintiffs' Count II argument is that Summit Avenue is not a "logical terminus" for the I–30 Project and that this illegal "segmentation" rendered the EIS prepared on the I–30 Project inadequate.

The only terminus which Plaintiffs challenge as illogical is Summit Avenue—the eastern terminus of the I–30 Project and the western terminus of the west leg of the I–35W Project. According to the trial testimony of Mr. French and Mr. Eaton (district design engineers for the State Highway Department), the Defendants ended the west leg of the I–35W Project at Summit Avenue in order to provide a safe, logical point at which the new construction can merge with the presently existing lanes of I–30.

■ Since it is logical to terminate a highway project where the complimentary upgrading of an adjoining segment ends, this Court concludes that Summit Avenue is a logical terminus for both projects. *See Bennett v. Taylor*, 505 F.Supp. 800, 809 (M.D.La.1980).

■ Moreover, notwithstanding the general rule that segmentation is improper for purposes of preparing environmental statements, "the rule against segmentation is not required to be applied in every situation." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. 1981) (citations omitted). More specifically, the Fifth Circuit has determined that in a case such as this one, the crucial inquiry in determining whether the transportation projects have been improperly segmented is not whether the projects have "logical termini" but whether the projects have "independent utility."

> "In a case such as the case at bar where the highway segments in question are not running between cities, but rather running through one city, logical termini are not so easily determined by a court. The more important inquiry in such a situation is whether the projects have independent utility."

*Piedmont Heights, supra,* at 440.

■ This Court cannot find that the I–30 and I–35W Projects lack independent utility and therefore must be assessed in the same environmental document simply because they happen to have a common terminus. As the Fifth Circuit has stated, "[t]he

projects, although interrelated as part of an overall transportation plan, should individually contribute to alleviation of the traffic problems in Atlanta, and are therefore not improperly segmented as separate projects." *Piedmont Heights, supra,* at 441. *See James River and Kanawha Canal Parks v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 635 (E.D.Va. 1973).

The record supports a similar conclusion in the case at bar. The evidence is insufficient to establish that either the I–30 or I–35W Project would have such little value in its own right as to make its construction arbitrary and capricious if the other project were not built.

■ As a further matter, the rule against segmentation developed in order to prevent environmental consideration of related highway segments in isolation of one another. *Piedmont Heights, supra,* at 440. The real NEPA controversy in this lawsuit focuses only upon the .9 mile Overhead and the property adjacent to it. Since this .9 mile stretch was not isolated and assessed in a vacuum nor was it divided and assessed as independent smaller segments, the policy against "segmentation" does not come into play. Instead, the entire Overhead was assessed in a Final Negative Declaration along with the rest of the I–35W Project, a project large enough for cumulative environmental impacts to be properly evaluated. Thus, the Defendants complied with the "statutory minima" of NEPA. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 548, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978).

## SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT OF 1966, 49 U.S.C. § 1653(f)

Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) prohibits the Secretary of Transportation from approving any federal-aid project "which requires the *use* of any public park ... or any land from an historic site of national, State, or local significance as so

determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park ... or historic site resulting from such use."

In Count III of their Amended Complaint, Plaintiffs allege that the Defendants failed to comply with Section 4(f) because the proposed expanded Overhead will "use" 4(f) properties when there are feasible and prudent alternatives "superior to the Defendants' proposed expansion ... and thus would minimize the harm to the Water Garden park and the Historic Sites," and because the Defendants "failed to prepare and circulate for public comment an adequate preliminary and final Section 4(f) statement ..."

■■■ The determinations under Section 4(f) that (1) there is no feasible and prudent alternative to the use of such land, and (2) all possible planning has been undertaken to minimize harm to such land are applicable only when Section 4(f) properties will be "used for a [federal-aid] highway project." If Section 4(f) property is not to be used, within the meaning of the statute, the Secretary need not make these secondary determinations. *Louisiana Environmental Society v. Coleman,* 537 F.2d 79 (5th Cir. 1976).

Thus, this Court's initial task is to determine whether the Secretary correctly followed Section 4(f) procedure and concluded that the proposed expansion of the present elevated freeway would not "use" Section 4(f) properties. "Basically, we are required to review the evidence the Administrator considered or should have considered, if any, and then determine whether the Administrator's determination is reasonable." *Louisiana Environmental Society, Inc. v. Brinegar,* 513 F.Supp. 179 (W.D.La.1981).

The Section 4(f) properties which lie in the same proximity as the Overhead are the Fort Worth Water Garden, the Post Office, the Texas & Pacific terminals, and the Public Market. Although none of these properties is to be physically used in connection with the proposed expansion, Plaintiffs contend that some or all of these properties will be "constructively used" if the Overhead is expanded as planned.[6]

■■■ In the Fifth Circuit, "use" within the meaning of Section 4(f) need not be "substantial use;" rather, "the spirit of *Overton Park* is clearly to the effect that the statute is to be read broadly ..." *Louisiana Environmental Society, Inc. v. Coleman, supra,* [citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)]. However, if there is no physical use of Section 4(f) property, the burden is on the Plaintiffs to establish that the proposed project will involve constructive use of protected properties. *Arkansas Community Organization for Reform Now v. Brinegar,* 398 F.Supp. 685, 692 (E.D.Ark. 1975); *cf. Sierra Club v. Lynn,* 502 F.2d 43, 52 (5th Cir.1974); *Sierra Club v. Callaway,* 499 F.2d 982, 992 (5th Cir.1974); *E.D.F. v. Corps of Engineers, U.S. Army,* 492 F.2d 1123 (5th Cir.1974).

■■■ It is undisputed that the Section 4(f) properties involved in this lawsuit are located in the same proximity as the present Overhead and will remain as such under the proposed expansion; however, none of the cases relied upon by the Plaintiffs stand for the principle that proximity alone constitutes constructive use. Rather, to establish a constructive use of the Water Garden, Plaintiffs would be required to show that the proposed project would result in a significant impairment of the uses for which the Water Gardens were designed. *See, Adler v. Lewis,* 675 F.2d 1085 (9th Cir.1982); *Brooks v. Volpe,* 460 F.2d 1193 (9th Cir.1972); *ACORN v. Brinegar,* 398 F.Supp. 685 (E.D.Ark.1975), *aff'd,* 531 F.2d 864 (8th Cir.1976). To establish constructive use of the historic buildings, Plaintiffs would be required to show that the proposed project would impair the historic value or quality of the properties.

---

**6.** The original design called for demolition of the Public Market. Subsequently, a Section 4(f) report was filed and an alternative design was adopted which leaves the Public Market intact.

*Nashvillians Against I–440 v. Lewis,* 524 F.Supp. 962 (M.D.Tenn.1981); *cf. Wilson v. Block,* 708 F.2d 735, 755 (D.C.Cir.1983). The Court concludes that the Plaintiffs have not shown the Secretary to have been unreasonable in concluding that neither the Water Garden nor the historic properties involved in this case will be so threatened.

The Water Garden is an urban park which was planned and built after the construction of the present Overhead. It was designed so as to shield the interior of the park from the sight of traffic. The south end of the park is separated from westbound Lancaster Street and I–30 by a wall 8 feet high, and by a row of live oak trees which line the inside of the wall and effectively screen the present Overhead from the users of the park. Although the expanded Overhead will be more visible than the existing structure to park users at the south end of the Water Garden, it will still be partially concealed by branches of the oak trees lining the south wall.

Noise levels as high as 88 decibels are currently generated from within the Water Garden by the park's own fountains and sprays. The south end of the park is also subject to high levels of traffic noise, due to the traffic on the existing Overhead. After performing a complete noise analysis within the park, Elton Hamill, the Defendants' expert, concluded that increases in noise levels within the park, upon completion of the expanded Overhead, will be between 3 and 4 decibels, an increase which will not be perceptible by persons in the park.

To establish constructive use of historic buildings, Plaintiffs were required to show that the proposed project would impair the historic value or quality of the properties. *Nashvillians v. Lewis, supra.* Noise and property value diminution will not impair the architectural integrity or the historic significance of the buildings in question. *Id.*

Furthermore, the administrative record supports a finding that the visual and other impacts of an expanded overhead and which Plaintiffs propose to mitigate with a depressed version, are impacts which result primarily from the existing Overhead, not from the proposed expansion. None of the evidence offered by Plaintiffs established any basis for quantifying, in concrete terms, the adverse impacts that could be attributed *solely* to the expansion of the Overhead. Thus, benefits which Plaintiffs claim would result from construction of the depressed alternative are speculative at best.

Most of the cases cited by the Plaintiffs in support of their "constructive use" theory deal with recreation or wilderness areas, rather than historic properties or uniquely designed urban parks such as are involved in this case. In *Brooks v. Volpe, supra,* a Ninth Circuit case cited by the Plaintiffs, the court found a campground to be constructively used when encircled by the proposed highway project since the campground's "isolation would be interrupted." *Alder v. Lewis, supra,* (explaining *Brooks v. Volpe, supra* ). Since preserving rural isolation is not an issue in the Section 4(f) properties involved in this case, the constructive use found by the Ninth Circuit in the *Brooks* case is inapposite to the case at bar.

Plaintiffs also rely on *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116 (5th Cir.1983) as support for the proposition that visual intrusion, or blocking the view of protected property would constitute a constructive use. First, as stated earlier, any *increased* visual intrusion or blocking of the view of properties involved in this case will be minimal under the proposed project. Secondly, *Louisiana Environmental Society* involved the choice between two alternatives, both of which physically used a part of the recreation area. The decision therefore did not involve the doctrine of constructive use; rather, it involved the second half of the Section 4(f) analysis—an evaluation to determine which alternative would minimize harm to the recreation area.

Although the Section 4(f) and Section 106 reports prepared by the Defendants did not specifically mention "the doctrine of con-

structive use," those reports described impacts that were so insignificant as to preclude any reasonable basis for such a discussion. Furthermore, other parts of the record show that the Defendants did specifically take this doctrine into account when they made their decisions.

In a letter to Senator Lloyd M. Bentsen, Jr., Secretary Lewis noted that he had reviewed not only the material submitted by the Central Business District Association, but had reviewed memoranda prepared by FHWA in Texas, by FHWA headquarters, and by the Office of General Counsel and other briefing materials. In addition, he considered the Negative Declaration, the Section 4(f) and 106 reports, and documents from the project file. [Ex. C 96].

The letter concludes that:

"The key to our determination was that the elevated freeway as now proposed would not result in a constructive use of the section 4(f) sites involved. I believe that to conclude otherwise would expand the coverage of section 4(f) far beyond the intent of congress and current judicial thinking and would result in serious problems for projects in other areas of the country. The project's impacts on the Fort Worth sites are not significantly greater than the existing impacts of the elevated structure. It is for this reason I determine that FHWA's initial decision was correct."

This Court concurs. Though there may have been technical deficiencies in the Defendants' Section 4(f) processings of the I–35W Project, "even under the exacting Section 4(f) requirements, the judicial branch may not 'fly speck' if it appears in its review, that all factors and standards were considered." *Louisiana Environmental Society, Inc. v. Dole, supra* at 122–23.

■ In light of this, the Court holds that the Section 4(f) processing of the I–35W Project was procedurally adequate and that the decisions made were both reasonable and supported by the record.

### 23 U.S.C. § 128—PUBLIC NOTICE AND HEARINGS

In Count IV of their Amended Complaint, Plaintiffs have alleged that Defendants violated Section 128 of the Federal-Aid Highway Act (23 U.S.C. § 128), as well as 23 C.F.R. Part 790 in that they "never issued public notice of a public hearing to consider the proposed expansion of the elevated I–30 Segment," nor have the Defendants "ever held a public hearing at which the proposed expansion of the Elevated I–30 Segment was adequately considered."

Although Section 128 does not itself set forth specific guidelines for complying with its notice and hearing requirements, the judiciary had regarded its general mandate for citizen participation in the planning and approval of highway projects as extremely important.

"This formal, regularized procedure, with due notice to all concerned, subjects officials to the differing views of competing interest groups and forces them to take account of prevailing views while the project plans are still being formulated."

*D.C. Federation of Civic Associations v. Volpe,* 434 F.2d 436, 441 (D.C.Cir.1970).

Basically, notice under Section 128 should be definite enough to put the public on notice as to the general location of a project and the nature of the improvements proposed. It need not, however, be sufficiently definite as to inform each individual property owner if his property will be affected. 23 C.F.R. § 790.7(a)(3) (1979).

As early as November 8, 1977, at the District Office meeting room, the State Department of Highways and Public Transportation (SDHPT) gave a thorough presentation of its plans to expand both I–30 and I–35W to the members of the Fort Worth City Council and staff. The purpose of the presentation was to inform the city leaders of the SDHPT's tentative plans for expansion. Present at the meeting were council members R.C. Newkirk, Mrs. Walter Barbour, James Bagby, Woodie Woods, Shirley Johnson, and Louis Zapata and staff members Don LaBelle, Gary Santerre, George

Human, and Gary Gwyn. The presentation itself included conspicuously displayed design plans for both the I–30 and I–35 Projects.

On March 21, 1978, the SDHPT mailed to a number of individuals and community organizations notice of a public meeting to be held April 25, 1978, to discuss "the proposed improvements to the South Freeway—IH 35W from the interchange of IH–30 and IH 35W South to the IH 35W—IH 20 interchange." The purpose of the meeting was "to obtain ideas and information from property owners and interested citizens preparatory to formal public hearing procedures on this project." A similar notice was published in the Fort Worth Observer and the Fort Worth Star-Telegram.

Approximately 65 people attended the public meeting, which was held at Grace Lutheran Church on the South Freeway. Leslie French, District Design Engineer for the SDHPT, explained at the meeting that the interchanges at each end of the proposed I–35W project would be enlarged and require an as yet undetermined amount of additional right-of-way. Exhibits displayed at the meeting showed the enlarged interchange between I–35W and I–30 would require the widening of I–30 from I–35W westerly to Jennings Street. Many questions were asked but no opposition to the proposal was expressed at the meeting.

A public meeting was also held on the proposed improvement of IH 30. Notices of the meeting were mailed April 18, 1978, to many individuals and local organizations, announcing that the meeting would be held on May 23, 1978, to "discuss the proposed expansion of the West Freeway—IH 30 from IH 820 and IH 30 west of Fort Worth, east to the IH 35–IH 30 Interchange with I–35W." The purpose of the meeting was "to obtain ideas and information from property owners and interested citizens preparatory to formal public hearing procedures on this project." Once again, similar notices were published in the Fort Worth Observer and Fort Worth Star-Telegram.

Approximately 300 people attended the I–30 public meeting held at the Will Rogers Auditorium. At the meeting Leslie French discussed the proposal to widen I–30 to eight lanes commencing at I–30 and I–820. The exact terminus of the interchange between I–35W and I–30 had not yet been determined. Exhibits displayed at the meeting showed the proposed expansion of I–30 adjacent to the Water Garden, the Texas & Pacific Passenger Terminal and the Post Office; however, discussion by those attending the meeting addressed only the Arlington Heights area of the proposed project, west of the Overhead.

The Fort Worth Chamber of Commerce was informed in 1978, by the SDHPT of its plans to widen the Overhead and geometrics of the proposed improvements were on file at the Chamber of Commerce.

A public hearing was scheduled for the I–35W Project on February 7, 1979. Notices of the hearing, published in the Forth Worth Star-Telegram and the Fort Worth News Tribune stated: "The proposed project is for the expansion of the existing four and six lane freeway to an eight lane freeway, and reconstruction of the interchanges with IH 20 and IH 30. Construction is proposed only within the existing right-of-way except at the interchange areas at the north end and south end of the project where additional right-of-way will be required." This notice was also mailed to the City, County, other Governmental agencies, civic organizations and individuals who were known to have a possible interest in the project.

Approximately 175 people attended the public hearing. Leslie French explained that enlargement of the interchange between I–35W and I–30 mandated widening of I–30 westward to Summit Avenue. None of the citizens who made statements at the hearing expressed concern about widening I–30 to Summit Avenue, nor opposition to the project otherwise.

On April 3, 1979, the SDHPT forwarded a transcript of the public hearing to the FHWA Division Office together with the required certification and two copies of the final Negative Declaration. The Final Negative Environmental Declaration was

approved and adopted by the FHWA Assistant Division Administrator on April 20, 1979.

At the time of the public meetings on the two projects in 1978, the SDHPT had not yet established the precise limit of the west increment of the interchange that was part of the I-35W Project. The proposed expansion of the elevated section of I-30 was, therefore, shown at both meetings. The terminus of the west increment of the interchange between I-35W and I-30 was finally established at Summit Avenue in the latter part of 1978, prior to the public hearing on the I-35W Project. Notice of the public hearing for the I-35W Project was, therefore, technically correct in its description of the project and was adequate. The hearing itself also adequately complied with Section 128. Moreover, the Defendants further supplemented the public participation processes with more hearings and procedures which, in fact, resulted in the implementation of certain mitigative measures.

▮▮▮ While the Defendants may have, at times, appeared to have been careless with the notice and hearing requirements of Section 128, there was not a bad-faith effort to deceive the public.[7] The Court holds that the Plaintiffs have failed to establish a right to injunctive relief under 23 U.S.C. § 128.

## DEPARTMENT OF TRANSPORTATION NOISE REGULATIONS

In Count V of Plaintiffs' five count Amended Complaint, they allege that Defendants violated "the DOT regulations governing traffic and construction noise related to federal highway projects, 23 C.F.R. Part 772, promulgated pursuant to 23 U.S.C. §§ 109(h) and (i) and 315, 42 U.S.C. §§ 4331-4332, and 49 C.F.R. § 1.48(b), by approving the proposed expansion of the Elevated I-30 Segment."

Under 23 U.S.C. § 109(i), enacted in 1970, the FHWA may "not approve plans and specifications for any proposed project on any federal-aid system ... unless it determines that such plans and specifications include adequate measures to implement the appropriate noise level standards."

The Court first notes that since the plans and specifications have not yet been approved for the Overhead section of the I-35W Project, neither the statutes nor the regulations in effect in 1979 required a detailed "noise study report" to be prepared. 23 C.F.R. § 772.11(c)(2) (1979).

Secondly, although the Defendants were not required to perform a detailed noise study on the Overhead for the Negative Declaration, they were required to prepare a noise analysis for the project as a whole. The Court finds that the noise analysis contained in the Final Declaration, which predicts noise levels the completed I-35W Project would produce at twenty-five separate locations along the route of the project, was prepared in accordance with procedures approved by the FHWA.

The Final Negative Environmental Declaration reported an existing $L_{10}$ noise level of 75 decibels, measured at a noise receptor located at the corner of Commerce and westbound Lancaster Avenue, adjacent to the existing Overhead—near the Water Garden. It predicted that 78 decibels would be the $L_{10}$ noise level generated at that location upon completion of the project. Although this is 3 decibels higher than the design $L_{10}$ level for noise in commercial areas such as that adjacent to the Overhead, the Defendants' expert testified that an increase of 3 decibels in the noise level is barely noticeable to a listener.

A 1983 SDHPT noise analysis of projected noise impacts on the Water Garden confirmed the earlier analysis in the Negative Declaration which indicated noise impacts on the Water Garden from the proposed project would be slight.

▮▮▮ Since plans, specifications, and estimates have not yet been approved for the

---

7. The only person who testified to being misled by the public notice of the I-35W hearing was Harold Frost, a non-resident living in New Hampshire, and his concerns were responded to by changes in the proposed design.

Overhead, there has been no final decision on attenuation measures which may be incorporated into the project to reduce the slight noise increases anticipated. However, the traffic noise analysis required, to date, under the FHWA regulations is contained in the Negative Declaration on the I-35W Project. Therefore, the Court holds that, at this time, Defendants have complied with the applicable statutes and regulations relating to noise and are entitled to the presumption that they will comply with the law in the future. *F.C.C. v. Schreiber*, 381 U.S. 279, 296, 85 S.Ct. 1459, 1470, 14 L.Ed.2d 383 (1965).

### Conclusion

Although this Court has made a searching and careful inquiry into the facts of this case, the ultimate standard of review to be applied is a narrow one. Furthermore, the Court is "not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). In applying this standard, it was necessary for the Court to determine first whether the Secretary acted within the scope of her authority. *Id.* After this determination it was incumbent on the Court to then decide whether the actual choice made was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) (Supp.V). "The final inquiry in a review of this nature was to ascertain if the Secretary's action followed necessary procedural requirements." *Overton Park, supra* at 417, 91 S.Ct. at 824. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

In reviewing the actions of the Secretary and following the standard of judicial review as set out above, this Court concludes, for the reasons set out herein, that the final decision of the Secretary must stand.

Accordingly, Plaintiffs' prayer for relief is in all things DENIED.