770 F.2d 423
 23 ERC 1239, 15 Envtl. L. Rep. 20,967
 CITIZEN ADVOCATES FOR RESPONSIBLE EXPANSION, INC. (I-CARE),
National Trust For Historic Preservation In the
United States, Ruth Carter Johnson and
Fidel Herrera, Plaintiffs-Appellants,
v.
Elizabeth DOLE, Secretary of U.S. Department of
Transportation, Ray Barnhart, Administrator of Federal
Highway Administration and Robert H. Dedman, Chairman of
State of Texas Highway and Public Transportation Commission,
Defendants-Appellees.
 No. 84-1180.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 23, 1985.
 
 Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex., Arnold & Porter, Scott Lang, Darrel J. Hieber, Washington, D.C., David Bonderman, Estil Vance, Jr., Fort Worth, Tex., for plaintiffs-appellants.
 James A. Rolfe, U.S. Atty., Claude D. Brown, Asst. U.S. Atty., Jean Rogers, James O. Price, Fort Worth, Tex., Jacques B. Gelin, David C. Shilton, Appellate Section, Washington, D.C., for defendants-appellees.
 David R. Thomas, Dallas, Tex., for M.G. Goode, Engineer-Director, State Dept. of Highways.
 Appeal from the United States District Court for the Northern District of Texas.
 Before REAVLEY, WILLIAMS and DAVIS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Concerns over the method chosen by state and federal officials to expand a segment of an interstate highway in downtown Fort Worth, Texas prompted this suit. The appellants, a group of citizens, community leaders, and businesspersons banded together as the Citizen Advocates for Responsible Expansion (I-CARE) and others, challenged the planned expansion on numerous environmental grounds. The challenge was mounted against the appellees, the Texas State Department of Highways and Public Transportation (SDHPT), the Federal Highway Administration (FHWA), and the Department of Transportation (DOT). The district court rejected appellants' claims, finding that the environmental review process was adequate and upholding the conclusion of the state and federal agencies that adverse environmental effects of the project would be minimal. I-CARE v. Dole, 586 F.Supp. 1094 (N.D.Tex.1984). We reverse.
 
 I.
 A. The Projects
 
 2
 A detailed presentation of the facts is essential to an understanding of the issues. Over a decade ago, a team of engineers, highway designers, and urban planners embarked upon the herculean task of relieving Fort Worth's exponentially growing traffic problems for the north-south and east-west traffic corridors. In 1976 and 1977, the appellees unveiled preliminary plans to expand from four to eight lanes an eight-mile section of Interstate 35W, a north-south highway, from Spur 280 on the north to an area just beyond Interstate 20 on the south. To relieve traffic congestion on the east-west corridor, the plan called for the expansion from four to eight lanes of Interstate 30 at an easternmost point beginning slightly east of I-35W and continuing approximately ten miles west, terminating just west of Interstate 820, a highway that encircles the city of Fort Worth.[1]
 
 
 3
 The point at which I-30 and I-35W meet is known affectionately by local commuters as the "Mixmaster," a complicated maze of highways, access roads, ramps, and merging lanes. It is located at or close to the southeastern corner of the central business district of the city. The area immediately west of the Mixmaster (and the north-south I-35W) on I-30 is a four-lane section of thirty foot high elevated east-west highway called the Overhead. The Overhead extends westward approximately one mile from the point at which the last lanes and ramps of the Mixmaster join I-30. The Overhead traverses the southern edge of the Fort Worth downtown area.
 
 
 4
 The existing Overhead overlooks a 4.3-acre public park known as the Water Garden, one of the most popular park facilities in Fort Worth, particularly for individuals working in or near the central business district. The Water Garden is comprised of terraced plantings and a series of waterfalls and pools surrounding a large stone plaza. It has received national acclaim for its unique design and the recreational opportunities it affords in an urban, downtown environment. The south end of the park, the part closest to the existing Overhead, consists of an amphitheater and a large grassy area. This section of the Water Garden is easily and quite regularly cordoned off and used for concerts, weddings, parties, and other private and community-sponsored events. This area also is the only place in the park where the Fort Worth Symphony Orchestra may perform, the only area for visitors to picnic or recline, and the only site where there are no water fountains to counterbalance unwanted noise.
 
 
 5
 The park includes features designed to minimize, as far as possible, the impact of the existing four-lane overhead highway, which is about 45 feet away from the southern end of the park. For example, a number of oak trees and an eight-foot tall stone wall partially block the existing Overhead from view and reduce the noise from the highway. The Overhead, once expanded, would be nine, rather than forty-five feet from the southern end of the Water Garden, and the massive concrete columns erected to support the expanded Overhead would be located merely five feet from the park. The traffic capacity of the expanded Overhead roughly would be doubled.
 
 
 6
 The existing Overhead also overlooks several buildings that are either on or eligible for inclusion on the National Register of Historic Places. The buildings, constructed in the 1930s, represent the craft and special design found in excellent architecture of that period and symbolize the early development of modern Fort Worth. These historic properties are: (1) The Fort Worth Main Post Office Building, an impressive 50-year old structure in the Renaissance Revival style, which spans an entire city block; (2) The Texas & Pacific Freight Terminal, a three-building complex, which displays the excellence of craftsmanship and design of the Art Deco movement of 1920-1940, and is still one of the most prominent features of the Fort Worth skyline; (3) The Texas & Pacific Passenger Terminal, which includes a 13-story office building and covers two city blocks, the Art Deco style of which makes it an example of the last era in modern building in which industrial crafts and individual workmanship played a predominant role; and (4) The Fort Worth Public Market Building, one of the few surviving examples of commercial Spanish Colonial Revival architecture in Fort Worth. The Texas & Pacific Passenger and Freight Terminals were added to the roll of the National Register of Historic Places in May 1978. The Public Market and Post Office buildings at present are not on the roll, but both have been determined to be eligible for inclusion on it.
 
 
 7
 The Post Office Building and the two Texas & Pacific complexes are clustered together and are parallel to the existing Overhead. The Public Market Building is located adjacent to I-30 near the westernmost end of the Overhead, approximately one-half mile from the three other buildings. The original plans for expanding the Overhead called for, in part, the complete demolition of the Public Market Building and the placement of massive concrete support columns on the sidewalk along the entire length of the front of the Post Office Building.
 
 
 8
 As to the buildings not to be demolished, the Post Office would be affected most dramatically by the proposed project. The facade of the front of the Post Office features sixteen impressive turned limestone columns that are topped with Corinthian-style capitals manifesting carved cattle heads. The entire building is veneered with cut limestone and is punctuated with numerous stone carvings and bronzed embossed medallions. The original project plans placed the expanded Overhead twenty feet from the front of the Post Office, rather than eighty feet as the existing Overhead is. Because the height of the expanded Overhead would be approximately that of the Post Office Building, the Overhead would create an awning-like effect on the front of the building, shading the building during parts of the day, obscuring practically any view of the sky, obstructing a view of the facade for all but close passers-by, and giving people standing on the steps of the Post Office a view of the numerous and rather unattractive Overhead support columns.[2] The effects on the Texas & Pacific buildings, while not as drastic in degree as those upon the Public Market Building or the Post Office, would be similar.
 
 B. The Environmental Review Process
 
 9
 The environmental review process the appellees undertook for the I-35W and I-30 projects, as they were required to do by a myriad of federal statutes[3] and implementing regulations, reveals a bizarre pattern of administrative indecision and/or confusion at best, or perhaps even public deception at worst.
 
 
 10
 At least in the early stages of the review process, the appellees unequivocally concluded that both projects would have significant adverse environmental effects, and they announced publicly that a full Environmental Impact Statement (EIS) would be prepared for each project.[4] In mid-1976, the appellees announced that an EIS would be prepared for the I-30 project. It is undisputed that, at that time, the Overhead, which actually is a part of I-30, was included in the I-30 project.[5] Mention is continually here made of the early inclusion of the Overhead in the I-30 project because it ultimately was changed over by the appellees into the I-35W project, even though I-35 is a north-south highway and the Overhead and I-30 of which the Overhead is a part are east-west highways.
 
 
 11
 In January 1978, the appellees similarly announced that an EIS would be prepared for the I-35W project, and they reaffirmed that the I-30 project mandated the preparation of an EIS. In March 1978, the appellees announced for the first time, and without explanation, that the I-35W project would have only some insignificant environmental effects and that a so-called Negative Environmental Declaration, rather than an EIS, would be prepared for that project.[6] At that time the appellees did not announce any change of the Overhead from the I-30 to the I-35W project.
 
 
 12
 In April 1978, the appellees conducted a preliminary, informational public hearing for the I-35W project, and in May 1978 they conducted a similar hearing for the I-30 project. The notices they published and distributed for each hearing did not say that the Overhead was included in the I-35W project. And while the exhibits displayed at the two meetings showed that the Overhead would be expanded, no exhibit suggested nor was anything said suggesting that the appellees considered the Overhead to be a part of the I-35W project. At the May hearing for the I-30 project, the appellees reasserted that an EIS would be prepared for that project. Between May and July 1978, in correspondence between both SDHPT and FHWA officials and regional and national FHWA officials, there is every indication that the Overhead was still included in the I-30 project, and there is no mention by any of these officials of any plan to shift the Overhead to the I-35W project.
 
 
 13
 In November 1978, the FHWA approved a Draft Negative Environmental Declaration for the I-35W project. The I-35W project, at that time, indisputably did not include the Overhead, and the Draft Negative Declaration unquestionably supports that conclusion. For example, the map included in the Draft Declaration purporting to show the "Limits of [the] Proposed I.H. 35W Project" excluded the Overhead from the project's limits, and neither the Overhead nor the areas adjacent to the Overhead were mentioned in the Draft Declaration. In addition, the appellees did not make or prepare any environmental test or study for any of the areas--residential, commercial, or historical--adjacent to the Overhead, whereas they made such tests and completed such studies for the areas alongside the eight-mile stretch of I-35W.
 
 
 14
 Before the Draft Negative Assessment for the I-35W project could gain final FHWA approval, the appellees needed to hold a public hearing and send a transcript of that hearing to the FHWA in Washington.[7] They scheduled the required public hearing for February 7, 1979, and on January 4, and February 1, 1979, published notices of that hearing in local Fort Worth newspapers. The appellees also mailed copies of the notice to various interested citizens, civic groups, and local governmental officials. The notices stated generally that the meeting was for the purpose of discussing the planned expansion of I-35W from I-30 on the north to I-20 on the south, and the improvements to various interchanges with the east-west roads. The notices neither implicitly nor explicitly mentioned either that the Overhead would be included in the I-35W, rather than the I-30 project, or that the plans to expand the Overhead would be the subject of any discussion at this meeting.[8] Copies of the notice were sent to individuals and businesses affected by the expansion of I-35W, but none were sent to persons or businesses affected by the Overhead expansion plans nor to public officials and private citizens who had specifically requested to be notified of any hearings concerning the Overhead. And the maps referred to in the public notice showed the Overhead outside the I-35W project's limits.
 
 
 15
 At the February 7, 1979, hearing, the SDHPT official presiding over the meeting mentioned for the first time publicly that the I-35W project would include a one-and-a-half mile section of I-30 that lies west of I-35W. The first half mile of I-30 extending west from I-35W contains a maze of ramps to and from the Mixmaster. The remaining mile or so, after the merging ramps have blended into I-30, constitutes the Overhead. Since prior to the February 7 hearing for the I-35W project the appellees had provided no notice that the Overhead had been shifted to the I-35W project, it is not surprising that no one concerned about the planned Overhead expansion attended that hearing. Instead, the comments made by members of the public at the hearing concerned increased noise levels on or near property adjacent to I-35W.
 
 
 16
 The appellees prepared and forwarded to the FHWA in Washington a transcript of the February 7 hearing, and on April 20, 1979, the FHWA approved the Final Negative Declaration for the I-35W project. The Final Negative Declaration was virtually identical to the Draft Negative Declaration, with one notable exception--the appellees had conducted one "noise" study in a single area zoned for commercial use approximately one block from the Water Garden. According to the appellees, that study revealed that the noise increases attributable to the additional traffic on the expanded Overhead, which would double the width and have twice the traffic capacity of the existing Overhead, would only be 3 dBA, an increase that is imperceptible to the average human. The appellees conducted no other studies concerning the possible, or even likely, environmental effects of the expanded Overhead. Significantly, no study was conducted concerning the potential visual effect the Overhead would have on either the Water Garden or the historic properties; no mention was made of historic buildings in the Final Negative Declaration; and the appellees in the Final Declaration neither mentioned nor documented their consideration of any alternative to the proposed Overhead expansion.
 
 
 17
 Consistent with their promise to prepare an EIS for the I-30 project (Overhead now excluded), the appellees in early 1980 prepared and released for public comment a draft EIS for that project.
 
 C. The Federal Court Suit
 
 18
 The appellants instituted this suit for declaratory and injunctive relief, challenging on numerous environmental grounds the method by which the appellees planned and ultimately secured approval of the highway projects. In Count I of their five-count complaint, the appellants alleged that the appellees violated NEPA by processing the I-35W project, which included the Overhead, with a Negative Declaration rather than an EIS. In Count II, they claimed that the appellees' decision to shift the Overhead, an east-west highway, from the I-30 project, an east-west project, to the I-35W project, a north-south project, constituted an arbitrary segmentation of the I-30 project, which under NEPA rendered as inadequate the EIS prepared for the I-30 project. The appellants in Count III charged that the appellees failed to comply with section 4(f) of the DOT Act because (1) the proposed expansion of the Overhead constituted an unnecessary constructive use of the Water Garden and historic sites, since feasible and prudent alternatives superior to the appellees' proposed expansion plans existed and (2) the appellees failed to prepare and circulate for public comment adequate preliminary and final section 4(f) statements. In Count IV, the appellants alleged that the appellees violated the public hearing and notice requirements of section 128 of the FAHA because they never issued public notice of a hearing to consider the proposed expansion of the Overhead. And in Count V they argued that the appellees violated DOT regulations governing traffic and construction noise limits related to federal highway projects.
 
 
 19
 After conducting a bench trial, the district court ruled for the appellees on each of the appellants' claims. Specifically, the district court (1) found as reasonable the appellees' decision to prepare a Negative Declaration rather than an EIS, since the proposed expansion would have no more than a minimal effect on the Water Garden and the historic properties; (2) concluded that the Overhead was not segmented improperly from the I-30 project, finding that the appellants failed to prove that the Overhead lacked utility independent of the remainder of I-30, (3) upheld the appellees' conclusion that the method of expanding the Overhead would not use, actually or constructively, any property protected by section 4(f); (4) concluded that the public notice and hearings for the I-35W project (including the Overhead) were technically accurate and therefore adequate, although the appellees may have been "careless" with the notice and hearing requirements; and (5) held that the appellees had not violated the DOT noise abatement regulations.
 
 
 20
 In this appeal, the appellants challenge the district court's findings and conclusions on all but the last issue.
 
 II.
 A. The NEPA Challenges
 
 21
 The appellants argue that the appellees' conduct violated NEPA in two respects--they erroneously and improperly concluded that an EIS need not be prepared for the expansion of the Overhead and they improperly "segmented" the Overhead from the I-30 project and shifted it into the I-35W project for the purpose of evading the environmental review process. We will address each argument in turn.
 
 
 22
 1. Negative Environmental Declaration vs. EIS
 
 
 23
 At the heart of this appeal lies the issue of whether the appellees properly concluded that the I-35W project, as including the Overhead, could be processed with a Negative Environmental Declaration rather than an EIS.
 
 
 24
 The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Secs. 4321-4361 (1982), requires the federal agency that is contemplating undertaking a "major Federal action[ ] significantly affecting the quality of the human environment" to prepare an EIS before the project is commenced. 42 U.S.C. Sec. 4332(2)(C).[9] Preparing the EIS requires the agency to conduct an exhaustive environmental review of the impacts of the proposed action, including those that are either unavoidable or irreversible, consider viable alternatives to the contemplated project, mitigate to the fullest extent possible harmful effects to the environment, enlist the advice of and comments from other agencies possessing expertise in areas relevant to the project under consideration, ensure through detailed notice and hearing procedures that members of the public may participate actively and in a meaningful manner in the decisionmaking process, and determine whether the proposed project should be completed as planned based upon a balanced consideration of all of the interests involved. Id. 23 C.F.R. Secs. 771.105, 771.111, 771.123 & 771.125 (1985).
 
 
 25
 NEPA operates to prevent a federal agency from taking any major action before that agency has considered the environmental effects of that action. See H.R.Conf.Rep. No. 765, 91st Cong. 1st Sess. (1969), reprinted in 1969 U.S.Code Cong. & Ad.News 2751, 2756, 2757 & 2771. See also S.Rep. No. 296, 91st Cong. 1st Sess. (1969); H.R.Rep. No. 378, 91st Cong. 1st Sess. (1969). The preeminent purposes of the process are to cause federal agencies to take a "hard look" at the environmental consequences of a proposed project, consider viable alternatives to the method chosen to achieve the aims of the project, and endeavor to minimize adverse environmental consequences of the proposal. See, e.g., Baltimore Gas and Electric Co. v. Natural Resource Defense Council, 462 U.S. 87, 98, 103 S.Ct. 2246, 2253, 76 L.Ed.2d 437 (1983); Vieux Carre Property Owners, Residents and Associates, Inc. v. Pierce, 719 F.2d 1272, 1281 (5th Cir.1983); Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 642 (5th Cir.1983).
 
 
 26
 Quite understandably, however, not all federal projects require authorities to prepare an EIS. For example, an EIS need not be filed for a project that neither is "major" nor "significantly affect[s] the quality of the human environment."[10] Citizens for a Better St. Clair County v. James, 648 F.2d 246, 249 & 250 (5th Cir.1981); Save the Bay, Inc. v. United States Corps of Engineers, 610 F.2d 322, 326 (5th Cir.), cert. denied, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980); Sierra Club v. Hassell, 636 F.2d 1095, 1097 (5th Cir.1981); Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 597 (9th Cir.1981). In Louisiana v. Lee, 758 F.2d 1081 (5th Cir.1985), we recently re-emphasized the appropriate test for reviewing the propriety of an agency's decision not to prepare an EIS:
 
 
 27
 Judicial review of an agency's decision not to file an environmental impact statement is governed by the rule of reasonableness. "The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and ... in good faith on a reviewable environmental record. If the decision is reasonable, 'the determination must be upheld.' "
 
 
 28
 Id. at 1083 (quoting Save Our Wetlands, 711 F.2d at 644). Under this standard the court must determine
 
 
 29
 whether the plaintiff has alleged facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 [If the plaintiff] raise[s] substantial environmental issues concerning the proposed recommended project ..., the court should proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects which would significantly degrade our environmental quality.... If the court concludes that no environmental factor would be significantly degraded by the project, [the agency's] determination not to file the impact statement should be upheld. On the other hand, if the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant [the plaintiff] such other equitable relief as it deems appropriate.
 
 
 33
 Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 & 467 (5th Cir.1973) (emphasis added), quoted in Lee, 758 F.2d at 1084.
 
 
 34
 These holdings establish that a plaintiff has the initial burden of alleging facts that show that a project would affect significantly some human environmental factor. If a plaintiff sustains this burden and the court concludes that the facts alleged are not patently incorrect or untrue, the case proceeds. If, after receiving the parties' evidence, the court concludes that the proposed project may affect significantly some human environmental factor, it must require the agency to prepare an EIS. The court, therefore, need not determine whether the proposed program would degrade the environment but merely whether the project might affect negatively and significantly a single environmental factor. Naturally, the court may not substitute its judgment for that of the agency, see Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980); Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 425 (5th Cir.1973), but must assess the reasonableness of the agency's determination on the basis of the information before the agency at the time the decision not to prepare an EIS was made. E.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 547, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978).
 
 
 35
 In making the threshold determination of whether the contemplated federal project requires an EIS, the federal authorities have the affirmative duty to prepare a reviewable administrative record. See Lee, 758 F.2d at 1083; Vieux Carre Property Owners, 719 F.2d at 1279 & 1281; Save Our Wetlands, 711 F.2d at 644; Harlem Valley Transportation Association v. Stafford, 500 F.2d 328, 337 (2d Cir.1974); First National Bank of Chicago v. Richardson, 484 F.2d 1369, 1381 (7th Cir.1973); Simmans v. Grant, 370 F.Supp. 5, 17 (S.D.Tex.1974). Although the record prepared need not contain the breadth and depth of information required by an EIS, it must give some consideration to many of the same factors considered when preparing an EIS.
 
 
 36
 In the instant case, the regulations in effect at the time the appellees decided that an EIS need not be prepared for the I-35W project required the appellees to prepare a so-called Action Plan. 23 C.F.R. Sec. 771.8(a) (1978). The purpose of the Action Plan was to "assure that adequate consideration [was] given to possible social, economic and environmental effects of proposed Federal-aid highway projects and that the decisions on such projects [were] made in the best overall public interest." Id. In the Action Plan, the appellees were required to (1) identify the social, economic, and environmental effects of the proposed action, (2) consider alternative courses of action, (3) provide for public involvement, and (4) utilize a systematic, interdisciplinary approach with other federal agencies. Id. Only after the Action Plan was developed could the appellees conclude that a Negative Declaration rather than an EIS should be prepared and filed.[11] Id. Sec. 771.8(b). If, after the Action Plan was completed, the appellees decided that they need not file an EIS, they prepared instead a Draft Negative Declaration. The Draft Declaration contained much the same information as the Action Plan but it also required the appellees to explain why they believed the proposed project would not have any significant environmental effects.[12]
 
 
 37
 These procedures demonstrate what information an agency needs to consider, and necessarily incorporate in the administrative record, at the time it concludes that an EIS is not required. If the agency gives inadequate consideration to these issues, or fails to demonstrate that it considered these issues by neglecting to document its actions in the administrative record, its determination not to prepare an EIS cannot withstand judicial scrutiny. Judge Bue stated this dilemma over a decade ago:
 
 
 38
 [E]ven though no formal impact statement is thought to be necessary, NEPA requires an agency to develop affirmatively a reviewable environmental record.... What is actually required under NEPA and [the implementing] regulations is that the federal agency prepare a "mini" environmental analysis after consultation with the appropriate agencies and authorities, although obviously not in the same detail as a regular environmental impact statement.... Without such a record it is impossible for a district court to determine whether or not the agency has complied with ... NEPA.
 
 
 39
 Simmans v. Grant, 370 F.Supp. 5, 17 (S.D.Tex.1974); cf. Vieux Carre Property Owners, 719 F.2d at 1281 ("The proper procedural vehicle for ... a determination [not to prepare an EIS] is an environmental assessment which provides a reviewable record of the agency's basis for its conclusions.").
 
 
 40
 While the administrative record supporting the Negative Declaration need not possess the same detail or clarity as an EIS and may, in part, be informal, mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS. Maryland-National Capital Park & Planning Commission v. United States Postal Service, 487 F.2d 1029, 1039 & 1040 (D.C.Cir.1973). In a similar vein, the administrative record the court must review to assess the reasonableness of the agency's action is the record in existence at the time the agency committed itself to a particular course or decision. Studies, statements, opinions, reports, rationalizations, or other assertedly relevant and non-duplicative evidence made or offered after the decision not to prepare an EIS has been reached to support that decision must be viewed critically and ordinarily cannot constitute part of the administrative record. In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 & 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), the Court said that affidavits prepared for trial, rather than the actual administrative record, constitute "post hoc rationalizations," which traditionally have been found to provide an inadequate basis for review, and must be viewed critically. See Lee, 758 F.2d at 1085 (quoting Overton Park ). We held in Sierra Club v. Hassell, 636 F.2d 1095, 1097 (5th Cir.1981), that government agencies must prepare the required meaningful environmental assessment and reviewable administrative record before reaching a decision on whether an EIS is necessary; an agency's decision not to file an EIS will be analyzed on the basis of the agency's findings and the information necessarily before the agency at that time. And as the Supreme Court said in Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972), "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."
 
 
 41
 The appellants attack the appellees' decision not to prepare an EIS on two grounds. First, they urge that prior to the time the appellees decided not to prepare an EIS, the appellees failed to compile an adequate and reviewable administrative record supporting that determination. Alternatively, they assert that the appellees' decision to prepare a Negative Environmental Declaration rather than an EIS was unreasonable, since the project raises substantial environmental issues. We find both challenges meritorious.
 
 
 42
 (a) The Adequacy of the Administrative Record
 
 
 43
 The appellees completely failed to shoulder their burden of developing an adequate and reviewable administrative record to support their determination that the concededly "major Federal action" of expanding the Overhead would not "significantly affect[ ] the quality of the human environment." It is clear that at the time the I-35W Draft Negative Declaration was approved and available for public inspection (November 13, 1978), the Overhead was not included in that project. Absolutely no consideration had been given to the environmental effects of expanding the Overhead at that time. Between November 13, 1978 and February 7, 1979, the appellees decided to shift the Overhead from the I-30 project into the I-35W project. On April 20, 1979, the Final Negative Declaration gained final FHWA approval.
 
 
 44
 Like the Draft, the Final Negative Declaration failed to identify, much less assess, the potential environmental consequences of expanding the Overhead. The Final Negative Declaration included the same project map as the Draft Declaration had presented. It showed the Overhead outside the project limits. Only one noise study had been conducted near the Overhead concerning likely increases in the level of noise attributable to the increased traffic flow on the expanded Overhead. That noise study, which concluded that the increases in the noise level would be slight and imperceptible to the average human, was conducted at a site zoned for commercial use near the Water Garden. As a result of that single noise study, the appellees determined in the Final Negative Declaration that any and all environmental impacts of the proposed plan would be minimal and not worthy of an EIS.
 
 
 45
 The Final Negative Declaration does not even mention the Water Garden much less assess the environmental or social impacts the expanded Overhead would have on the park. At the time the appellees issued their Final Negative Declaration, they had conducted no study concerning potential noise increases in the Water Garden.[13] In addition, the appellees never made any assessment, formal or informal, concerning potential or even likely adverse visual or aesthetic consequences of the project on the park and the concomitant lessening of the quality of the ambience of the park to its users.
 
 
 46
 Urban planners, architects, and developers who testified for the appellants at trial stated that the expanded Overhead, which would be double its present width and would be five rather than forty-five feet from the park, would present a massive "wall-like" appearance to people within the park. The resulting visual and aesthetic impact would give the park an uninviting, inhumane quality and detract from its carefully conceived design. These experts also testified that the oak trees along the park's southern wall no longer would screen effectively the Overhead from view, and the views from the southeast and southwest, which are not screened by trees, would become particularly unpleasant if the Overhead was expanded.[14] Other witnesses testified that the visual, aesthetic, and noise impacts of the expanded Overhead would render the southern half of the park virtually useless.
 
 
 47
 In addition to the inadequate attention given in the Final Negative Declaration to the effects the expansion plans would have on the Water Garden, the document also incorrectly stated that no historic sites would be affected by the project. That conclusion was based on a letter from an officer of the Texas Historic Commission, the agency entrusted with ensuring that Negative Declarations and EISs adequately account for and accommodate historic property and interests. In the letter, which is included in the Final Declaration, the officer stated that no historic properties would be affected by the I-35W project. The author of that letter testified at trial that the SDHPT had solicited his advice and requested that he identify any historic properties that might be affected by the I-35W project. The documents and maps the SDHPT officials provided him to make the assessments, however, did not include the Overhead as part of the I-35W project. The author, therefore, did not consider the effects the Overhead expansion plans would have on the Fort Worth Main Post Office Building, the Texas & Pacific Freight Terminal, the Texas & Pacific Passenger Terminal, or the Fort Worth Public Market Building. He testified that there was no doubt that the planned Overhead expansion would affect adversely these properties and that his report and letter would have reflected that conclusion had he been informed that the Overhead was included in the I-35W project.[15]
 
 
 48
 It is, therefore, apparent that the appellees gave inadequate consideration to the effects of the project on the historical properties. By the time the FHWA approved and issued the Final Negative Declaration, the two Texas & Pacific complexes had been registered in the National Register. And since the appellees had conducted no studies of the historic property in the area, they did not learn that the Post Office and Public Market buildings possessed qualities that made them eligible for inclusion on the Register.[16] In any event, prior to the time the Draft Negative Declaration gained final FHWA approval, the defendants had never considered any of the consequences--noise, visual, aesthetic, traffic, or otherwise--the project would have on any of the historic buildings. Indeed, the negative visual impacts the expanded Overhead would have on the Post Office were so great that in 1981, after it began considering operating the Post Office Building and had learned of the expansion plans, the United States General Services Administration (GSA) sent an unsolicited letter to the SDHPT complaining that the expanded Overhead would (1) constitute an "obvious adverse visual intrusion" on the Post Office, (2) "isolate" the building from the central business district, and (3) sharply depress the commercial rental value the building otherwise would possess.
 
 
 49
 In summary, the administrative record in this case reveals that the appellees never gave any meaningful consideration at all to the environmental consequences of the Overhead expansion. They decided upon a Negative Declaration before they had shifted the Overhead into the I-35 project, and they added nothing by way of environmental consideration once they had made the change.[17]
 
 
 50
 (b) Whether an EIS Was Required
 
 
 51
 We have found as inadequate the administrative record upon which the appellees based their conclusion that a Negative Declaration could be processed for the I-35W project. In the interest of administrative and judicial economy we nevertheless possess discretion as a reviewing court to determine whether an EIS was required based upon both the administrative record and the later-developed evidence that was prepared for and presented at the trial. In Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 425 (5th Cir.1973) we held that the district court may supplement a deficient administrative record by taking evidence on the environmental impact of the project and determine for itself the reasonableness of the agency's action. And in Asarco, Inc. v. EPA, 616 F.2d 1153, 1161 (9th Cir.1980), the Ninth Circuit held that it possessed discretion to review the administrative record, supplemented by proper explanatory evidence developed in the district court, to determine for itself the reasonableness of the agency's action.[18] We stress that in making the evaluation of the need for an EIS, we are not drawing any conclusions as to the merit of the project proposals or the proper way to accommodate environmental concerns with project goals. We only decide whether the agency has met the statutory requirement of developing an EIS.
 
 
 52
 The regulations in effect in 1978 identified a nonexhaustive list of the types of actions that ordinarily will be deemed to have a significant effect upon the quality of the human environment and require the agency to prepare an EIS:
 
 
 53
 (1) An action that has more than minimal effect on properties protected under section 4(f) of the DOT Act or section 106 of the [National] Historic Preservation Act.
 
 
 54
 (2) An action that is likely to be highly controversial on environmental grounds or with respect to the availability of adequate relocation housing.
 
 
 55
 (3) An action that is likely to have [a] significantly adverse impact on natural, ecological, cultural or scenic resources of national, State or local significance.
 
 
 56
 (4) An action that (i) causes significant division or disruption of an established community or disrupts orderly, planned development, or is determined to be significantly inconsistent with plans or goals that have been adopted by the community in which the project is located, as determined by a responsible official(s); or (ii) causes a significant increase in traffic congestion.
 
 
 57
 (5) An action which (i) is determined to be inconsistent with any Federal, State or local law or regulation relating to the environment; or (ii) has a significant detrimental impact on air or water quality or on ambient noise levels for adjoining areas; or (iii) may contaminate a public water supply system.
 
 
 58
 23 C.F.R. Sec. 771.10(e) (1978).
 
 
 59
 Section 4(f) of the DOT Act, 49 U.S.C. Sec. 1653(f) (1976) (repealed Jan. 12, 1983; reenacted in substance at 49 U.S.C. Sec. 303 (1982)), provides that the Secretary of Transportation
 
 
 60
 shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.
 
 
 61
 Under section 4(f), property determined to be eligible for inclusion on the National Register of Historic Places is afforded the same protection as those properties already on the roll. Benton Franklin Riverfront Trailway and Bridge Committee v. Lewis, 701 F.2d 784, 788 (9th Cir.1983); Stop H-3 Association v. Coleman, 533 F.2d 434, 442 & n. 15 (9th Cir.), cert. denied, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). Section 106 of the NHPA, 16 U.S.C. Sec. 470f (1982), similarly requires the head of any agency contemplating a federal or federally-assisted undertaking to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register."
 
 
 62
 23 C.F.R. Sec. 771.10(e), therefore, required the highway officials to prepare an EIS for any project having "more than [a] minimal effect" on publicly owned parklands or bona fide historic buildings. As we previously mentioned, however, when determining the propriety of an agency's decision not to prepare an EIS, the reviewing court need not determine whether the contemplated project would affect some human environmental factor. Lee, 758 F.2d at 1084; Save Our Ten Acres, 472 F.2d at 467. Rather, the "court should require the filing of an impact statement," "if the court finds that the project may cause a significant degradation of some human environmental factor." Lee, 758 F.2d at 1084 (emphasis in original and quoting Save Our Ten Acres, 472 F.2d at 467).[19]
 
 
 63
 We need to determine, therefore, no more than whether the Overhead expansion might affect above a minimal level these environmentally sensitive parkland and historic properties. We do not detail the evidence that was introduced at trial. It is sufficient to say that our reading of the record reveals with clarity that the Overhead expansion could affect significantly the environment in ways of statutory concern. The most environmentally sensitive area, and the one that the greatest number of the general public enjoy the most, is the Water Garden. Uncontroverted testimony at trial from engineers, city planners, designers, architects, and others established the degree to which the expansion plans would affect the park. Some of these witnesses testified that the aesthetic and visual intrusion, which is now absent or minimal, would be tremendous and have a great impact upon current uses of the park. We report specifically only one witness's testimony, that of former Assistant Secretary of Transportation William Johnson, the highest ranking DOT official responsible for reviewing and approving EISs at the time the appellees conducted the environmental analyses for the I-35W project. Assistant Secretary Johnson did not review the Overhead expansion plans or the Negative Declaration in 1978 or 1979 because the appellees' decision to process the I-35W project with a Negative Environmental Declaration rather than an EIS prevented the project from coming to his attention. Upon learning all of the relevant facts, however, Assistant Secretary Johnson testified that "there is no doubt" that the Overhead expansion would have "significant impacts on the park" and historic buildings which "should have been recognized" and "should have triggered ... an EIS." He also testified:
 
 
 64
 If the facts that I have now reviewed were brought to my attention, there is absolutely no doubt that I would have required that an E.I.S. be done.... When I look at the total record, I am amazed that no E.I.S. was done and that no 4(f) [report] was done that fully considered all of the potential impacts at the sites. It's so inconsistent with the way this process is normally conducted.
 
 
 65
 In view of the administrative and judicial records, we conclude that the planned expansion may affect significantly some human environmental factors. The appellees' decision not to prepare an EIS for the I-35W project, therefore, was unreasonable and must be reversed.[20]
 
 
 66
 A final limitation must be stated. All of the parties focus much of their arguments upon proposals that are alternatives to the expansion of the Overhead. These alternatives are not our concern. Our holding is that the procedures required by law in evaluating the impacts of and alternatives to the proposed action were not carried out. The decision the appellees ultimately reached was not made in accordance with the law. In reaching a lawful decision, the agencies must afford meaningful imput by members of the community through the numerous procedural and substantive safeguards of NEPA, the FAHA, and the other related statutes.
 
 
 67
 2. Improper Segmentation of the Overhead from the I-30 Project
 
 
 68
 In their remaining NEPA claim, the appellants argue that the appellees improperly segmented the Overhead from the I-30 project and shifted it into the I-35W project, thereby rendering as inadequate the EIS prepared for the I-30 project. See, e.g., Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir.1981); Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1023 (5th Cir.1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). The appellants do not challenge as improper or erroneous any aspect of the EIS prepared for the I-30 project; they claim only that the Overhead should have been included in that project. The sole relief the appellants seek for this alleged improper segmentation is an EIS that adequately accounts for and accommodates the environmental effects of the expanded Overhead. Since we already have concluded that the appellees were required to prepare an EIS for the I-35 project as it included the Overhead, we need not address the merits of the segmentation argument. It is enough that the environmental impact of the proposed Overhead expansion must be made the subject of EIS consideration.
 
 
 69
 B. The Belated and Deficient Section 4(f) Report
 
 
 70
 The appellants also challenge the adequacy of a section 4(f) report prepared by the appellees nearly two years after the appellees issued the Final Negative Declaration for the I-35W project.[21] Section 4(f) prohibits the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways that will "use" land from a historic site or a publicly-owned park unless the Secretary concludes that (1) no feasible and prudent alternative to the use exists and (2) all possible steps necessary to minimize the harm have been taken. 49 U.S.C. Sec. 1653(f) (1976). The section 4(f) report the agency prepares is designed to document the agency's consideration of alternatives and provide support for the ultimate conclusions the agency has reached.
 
 
 71
 In the section 4(f) report the appellees eventually prepared, they concluded that the expanded Overhead would have minimal environmental effects on all of the historic sites other than the Public Market Building.[22] They found that while the proposed plan called for taking part of the property on which the Public Market Building stood, no feasible or prudent alternative to that taking existed. The appellees explicitly stated in that report that the Water Garden unquestionably constituted property protected by section 4(f). Yet, they did not mention the Water Garden again in the report, and the effects the expanded Overhead would have on the Water Garden are not considered in the report.
 
 
 72
 In rejecting the appellants' challenges concerning the adequacy of the report, the district court concluded that the potential effects of the expansion plans were so minimal that the Overhead expansion would not "use" within the meaning of section 4(f) any property protected by that section. The district court therefore found as reasonable the appellees' failure to evaluate the impact upon these properties in the report. We find that the district court erroneously concluded that the Overhead expansion would not "use" environmentally-sensitive property protected by section 4(f).
 
 
 73
 As the district court recognized, most courts have concluded that the term "use" in section 4(f) should be construed broadly and embraces the constructive use doctrine.[23] To constitute a constructive use, the off-site activities of the proposed project must impair substantially the value of the site in terms of its environmental, ecological, or historical significance. See, e.g., Louisiana Environmental Society v. Coleman, 537 F.2d at 85; Adler v. Lewis, 675 F.2d at 1092. The district court concluded that to succeed on their section 4(f) claim, the appellants had the burden of establishing by a preponderance of the evidence that the proposed plans would use constructively the protected properties. 586 F.Supp. at 1103 & 1104. This, however, was the wrong standard upon which to judge the sufficiency of the appellants' case.
 
 
 74
 In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Court made clear that the determinations and conclusions an agency reaches in the section 4(f) process are subject to "a thorough, probing, in-depth review." Id. at 415, 91 S.Ct. 823. In Save Our Ten Acres, we concluded that the Overton Park standard for reviewing the propriety of an agency's section 4(f) determinations is the same as that for reviewing the propriety of an agency's decision not to prepare an EIS. 472 F.2d at 466; accord Adler, 675 F.2d at 1092 (an action which "significantly affect[s] the quality of the human environment" also is one which would constitute a "use" within the meaning of Sec. 4(f)). Both types of decisions are subject to the "reasonableness" standard of review. Thus, the plaintiff has the burden of alleging facts which, if taken as true, show that the contemplated project will "use" in some significant way parkland or historic sites. If the plaintiff sustains this burden, the court need determine only whether the proposed project may constitute a "use", constructive or actual, of the statutorily protected sites. Save Our Ten Acres, 472 F.2d at 466; Adler, 675 F.2d at 1092.
 
 
 75
 We conclude that the appellants sustained their burden of alleging facts which showed that the proposed project would use constructively the sites protected by section 4(f). And since we already have concluded in part II(A)(1)(b) of this opinion that the proposed project may affect significantly the quality of some human environmental factors, we need not discuss in detail the extent to which the effects of the Overhead expansion may "use" the protected properties. Suffice it to say that both tests--NEPA's "significantly affecting the quality of the human environment" test and section 4(f)'s "use" test--roughly are equivalent. Adler, 675 F.2d at 1092. We pause to note, however, two additional facts that render this section 4(f) report deficient. First, the appellees in the report gave absolutely no consideration to the effects the expanded highway would have on the Water Garden. Second, it borders on the ridiculous to suggest that the expanded Overhead would have minimal impacts on the Post Office, a building possessing magnificent exterior features that likely would endure tremendous impacts from the expansion plans. See supra at sl. op. 6715 & n. 2, 427, 428 & n. 2. E.g., Stop H-3 Association, 533 F.2d at 439.
 
 
 76
 C. The Notice and Hearing Requirements of Section 128 of the FAHA
 
 
 77
 In their final challenge, the appellants argue that independent of any of their other arguments, the appellees violated the notice and hearing requirements of section 128 of the Federal-Aid Highway Act, 23 U.S.C. Sec. 128 (1982). Section 128 requires every state highway department that has submitted plans for a federal-aid highway project that traverses a city or town to certify that it either has conducted public hearings or has afforded the opportunity for such hearings and has considered the environmental, economic, and social effects of the project on the selected location. Id. Sec. 128(a). Rights secured by section 128 are of critical importance. In enacting Section 128, Congress endeavored to ensure that highway planners be confronted directly and publicly with opposing views during the planning stage by those people with interests most immediately affected by the proposed highway project, the local citizens. D.C. Federation of Civic Associations, Inc. v. Volpe, 434 F.2d 436, 441 (D.C.Cir.1970). The courts have recognized that the section 128 hearing process confers on the public "fundamental rights" and "the only form of direct citizen participation in decisions about construction of massive freeways, decisions which may well have more direct impact on the lives of residents than almost any other governmental action." Id. at 441.
 
 
 78
 The federal regulations promulgated to implement section 128 provided that "each notice of [a] public hearing shall specify the date, time, and place of the hearing and shall contain a description of the proposal." 23 C.F.R. Sec. 790.7(a)(3) (1978). As the district court correctly acknowledged, the description of the project need not be so specific as to inform each individual property owner that his or her property will be affected. I-Care, 586 F.Supp. at 1105. In view of the affirmative burden on the part of highway agencies to facilitate adequate and informed public participation in the early decisionmaking process, however, it is axiomatic that the notice given must be specific enough to put the public on notice about (1) the project's general bounds and (2) the agency's method of achieving the aims of the project. See, e.g., Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1338 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); Rankin v. Coleman, 394 F.Supp. 647, 660 (E.D.N.C.1975). See also 23 C.F.R. Sec. 771.5 (1978) ("The ... negative declaration should clearly identify the length or segment of the total highway section that is proposed for improvement;" emphasis added); 23 C.F.R. Sec. 790.7 (1978).
 
 
 79
 The record establishes beyond cavil a total failure by the appellees to meet the statutory requirements of this public hearing process with respect to the I-30 Overhead expansion. No notice was ever given nor public hearing held regarding the Overhead expansion plans. The appellees concede that they first announced publicly that the I-30 Overhead was part of the I-35W project at the February 7, 1979 public hearing on that project. In addition, the published notice for that hearing did not even mention the Overhead; the Draft Negative Declaration referred to in the published notice also excluded the Overhead; no notice of the hearing was mailed to affected property owners along the Overhead--not even to those who had previously requested such notice; the notice that the appellees did send to persons along I-35W had an attached map which excluded the Overhead from the I-35 Project; and the maps and diagrams referred to in the notice indicated that the Overhead was not in the I-35W project.
 
 
 80
 The appellees are forced to argue that the reference to the I-35W/I-30 "interchange" in the notice they issued reasonably informed the public that the Overhead was included in the I-35W project. This contention, however, is belied by concessions made by several of the appellees' own expert witnesses to the effect that based upon the notices given no reasonable person would have known that the Overhead was included in the I-35W project.
 
 
 81
 The district court concluded that "[w]hile the defendants may have, at times, appeared to have been careless with the notice and hearing requirements of Section 128, there was not a bad-faith effort to deceive the public." 586 F.Supp. at 1107.[24] We do not quarrel with this finding. Section 128, however, does not embody a good-faith but careless exception to the notice and hearing requirements. This record demonstrates conclusively that the appellees failed to satisfy the explicit notice and hearing requirements of section 128 and the implementing regulations.
 
 III.
 
 82
 We conclude that the appellees created a wholly inadequate administrative record in support of their decision to prepare a Negative Environmental Declaration for the I-35W project once the Overhead expansion was included in that project. The record fails because they never made an environmental impact evaluation of the Overhead expansion. We also conclude that appellees were required by law to prepare an EIS for that project, that they prepared a belated and inadequate section 4(f) report, and that they conducted procedurally inadequate environmental hearings. We grant the appellants' request for injunctive relief until there has been compliance by the appellees with the mandate of this opinion. See Richland Park Homeowners Association, Inc. v. Pierce, 671 F.2d 935, 941 (5th Cir.1982) (injunctive relief halting construction and preserving the status quo is the normal and proper remedy for an agency's failure to comply with NEPA); Louisiana Environmental Society, Inc. v. Coleman, 537 F.2d at 89 (injunctive relief granted where hearing requirements of FAHA have not been satisfied); San Antonio Conservation Society, 446 F.2d at 1029 (injunctive relief warranted for violations of NEPA and section 4(f) of the DOT Act).
 
 
 83
 We remand the case for further proceedings related to the environmental review of the Overhead expansion. Since the parties have not complained of the manner in which the appellees processed the remainder of the I-35W project and since the environmental effects of that aspect of the project appear to be no more than minimal, the appellees may elect to review the environmental effects of the expanded Overhead independent of the remainder of the I-35W project and may delete the rest of the project from the EIS process. We emphasize that we express no opinion upon the merits of the dispute, and we hold only that the appellees failed to carry out procedures required by law.
 
 
 84
 JUDGMENT OF THE DISTRICT COURT REVERSED AND REMANDED.
 
 APPENDIX A
 
 85
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 Although both projects were part of a comprehensive traffic plan, from the outset they were treated separately and were known as the I-35W project and the I-30 project respectively. See Appendix A for a general map detailing the bounds of each project
 
 
 [2]
 In 1981, several years after the appellees created and unveiled the original plans, and in response to the rapidly growing public criticism of the effects of the planned Overhead on the historic buildings, the appellees created new plans for the expanded Overhead that supposedly would minimize the detrimental effects on the historic buildings. For example, rather than destroy the Public Market Building, the new plans called for preserving the structure, but not all of its adjacent property, by surrounding it with freeway ramps and lanes, effectively placing it in the middle of a cloverleaf but by this means choking it off from ready access and rendering its commercial viability and eventual rehabilitation doubtful. Likewise, the modified plans called for reducing by one lane the overall width of the expanded Overhead in front of the Post Office Building and the Texas & Pacific Freight complex. Rather than being twenty feet from the Post Office, as under the original plans, the expanded Overhead would be forty feet away
 
 
 [3]
 These statutes included the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Secs. 4321-4361 (1982); Section 4(f) of the Department of Transportation Act of 1966 (DOT Act), 49 U.S.C. Sec. 1653(f) (1976) (repealed Jan. 12, 1983; reenacted in substance at 49 U.S.C. Sec. 303(c) (1982)); Section 128 of the Federal-Aid Highway Act (FAHA), 23 U.S.C. Sec. 128 (1982); and the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. Secs. 470-470n (1982)
 
 
 [4]
 An EIS is required anytime a contemplated "major Federal action[ ]" is deemed to have a "significant[ ] [e]ffect[ ] [on] the quality of the human environment." See Section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. Sec. 4332(2)(C). The EIS process requires the agency contemplating undertaking the action to conduct an exhaustive and detailed analysis of the environmental consequences of the proposed project, examine feasible alternatives to the proposed undertaking, solicit comments from other federal agencies, and provide members of the public with ample opportunities to register their support for or opposition to the proposed plan. Id; see also 23 C.F.R. Secs. 771.3, 771.10, 771.12, 771.14 & 771.18 (1978) (currently found at 23 C.F.R. Secs. 771.101-771.135 (1985)). See also infra at 432-433
 
 
 [5]
 For example, early cost estimates for both projects conclusively reveal that the appellees intended the Overhead expansion to be included in the I-30 project. And project maps included with preliminary assessments made in 1976 of the social and environmental consequences of the projects showed the I-30 project to include both the Overhead and those aspects of the Mixmaster lying west of I-35W
 
 
 [6]
 At the time the appellees determined that an EIS would not be prepared for the I-35W project, then-existing federal regulations mandated that they prepare the Negative Environmental Declaration (NED). 23 C.F.R. Secs. 771.10 & 771.11 (1978). The NED basically required the agencies to (1) state why they believed the proposed project would have insignificant environmental effects and (2) provide documentation supporting that conclusion. The NED process possesses numerous and significant differences from the EIS process. First, when preparing the NED, the agency need not examine or analyze the environmental consequences in as much detail or with as much depth as is required when preparing an EIS; second, the agency ordinarily need not devote as much time to the development and consideration of alternatives; third, the NED is only a fraction of the length of an EIS; and fourth and most significantly, the NED process provides for limited public participation whereas the EIS process affords expansive involvement by the public. In sum, the Negative Environmental Declaration process is an abbreviated environmental review, designed in large part to support an agency's already-held conclusion that a proposed project will have insignificant environmental impacts
 
 
 [7]
 See 23 C.F.R. Secs. 771.5(c), 771.8, 771.10(a), 771.11(c), (d) & (e). See also 23 C.F.R. Secs. 790.1-790.11 (1978)
 
 
 [8]
 For example, the notice published on February 1, 1979, in the Fort Worth Star-Telegram provided, in pertinent part:
 The State Department of Highways and Public Transportation will conduct a public hearing at 10:00 A.M., Wednesday, February 7, 1979, at Town Hall--South Arcade, Seminary South Shopping Center, Fort Worth, Texas for the purpose of discussing the improvements to IH 35W from IH 30 (East-West Freeway) south to IH 20 (South Loop) in the City of Fort Worth.
 The proposed project is for the expansion of the existing 4 and 6 lane freeway to an 8 lane freeway, and reconstruction of the interchanges with IH 20 and IH 30. Construction is proposed only within the existing right of way except at the interchange areas at the north end and [at] the south end of the project where additional right of way will be required....
 Maps and other drawings showing the proposed location and design will be displayed at the public hearing; these drawings, together with the draft negative environmental declaration and any other information about the project, are on file and available for inspection and copying at the District Engineer's Office....
 Also, the maps and drawings showing the proposed location and design have been placed on file with the City of Fort Worth at the City Hall....
 * * *
 (emphasis added)
 
 
 [9]
 The phrase "Federal action" also includes those projects undertaken or performed essentially by the states but funded in whole or in part by the federal government. See 42 U.S.C. Sec. 4332(D). The instant project fits this category
 
 
 [10]
 In this case, there is no dispute that the expansion of the Overhead constitutes a "major Federal action[ ]"; the parties' disagreement instead focuses on whether the project "significantly affect[s] the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C); see I-CARE, 586 F.Supp. at 1098-99
 
 
 [11]
 In 1980, the language of those regulations was modified slightly, but the substantive effect remained virtually the same. For example, rather than preparing an "Action Plan" before embarking upon a particular course of conduct or even before deciding whether an EIS need be prepared, officials must now prepare a so-called Environmental Assessment (EA). 23 C.F.R. Sec. 771.119 (1985); see also 23 C.F.R. Secs. 771.115(c) & 771.121(a) (1985). And the term "Negative Declaration" has been removed from the vocabulary of environmental inquiry. Rather than preparing that document, officials must now prepare a written "finding of no significant impact" (FONSI). 23 C.F.R. Sec. 771.121 (1985)
 
 
 [12]
 23 C.F.R. Sec. 771.11 (1978) defined a Draft Negative Declaration and provided, in pertinent part:
 (b) A draft negative declaration is a written document which records the determination that implementing the proposed action will not have a significant effect upon the quality of the human environment. The negative declaration is to include pertinent information about the highway section such as:
 (1) A description of the proposed action, need for the action, alternatives considered, and bases for the recommendation that the proposed action is not anticipated to have a significant impact upon the quality of the human environment.
 (2) The social, economic, environmental and other effects considered.
 (3) Map(s) showing the alternative(s).
 (4) Other comparative data, such as costs, transportation requirements, engineering factors, etc.
 (5) A discussion of the issues and comments received from other agencies, organizations and the public during the highway section development and coordination.
 
 
 [13]
 In preparation for trial the appellees conducted noise studies at the Water Garden. The district court relied upon these studies in concluding that the expanded Overhead would have minimal effects on the noise levels within the Water Garden. Notwithstanding both the likely dubiousness of studies conducted after the determination not to prepare an EIS has been made and the great reluctance to accept such studies, the instant, after-the-fact noise studies are severly flawed. The appellees' noise expert testified at trial that the noise increase attributable to expanding the Overhead would be only about 3 or 4 dBA, an increase imperceptible to the average human. He conceded, however, that these noise studies did not account for either the tremendous noise increases that would be caused by the 400 or so trucks that would use the Overhead each hour during the daily peak traffic periods or the "reverberation" noise caused by traffic along Lancaster Avenue, a four-lane road that runs parallel to and directly under the length of the Overhead. He testified that the trucks passing along the highway would generate intermittent noise levels of over 90 dBA in the park, a sound roughly equivalent to the noise level three feet from an operating gasoline-powered lawn mower. See Final Negative Declaration at 42. And despite the "unique environmental impact" of reverberation noise caused by traffic beneath overhead freeways, see D.O.T., Highway Improvements to Support Downtown Revitalization, at 20 (1980) (unpublished report by the Secretary of Transportation to Congress in compliance with section 159 of Surface Transportation Assistance Act of 1978, Pub.L. No. 95-599 Sec. 159, 92 Stat. 2689, 2718-2719 (1978)), the study did not even mention this problem because the appellees' expert claimed he did not know how to measure it. Not surprisingly, numerous witnesses for the appellants testified that these noises would render much of the south lawn of the Water Garden useless for most of its present purposes, including concerts, parties, picnics, or even conversation
 
 
 [14]
 On the last page of the Final Negative Declaration, the following boilerplate statement appears:
 The aesthetic effect of this project will be in harmony with its environment and visually pleasing to the community.
 Notwithstanding that the same statement appears in the Draft Negative Declaration, which was prepared before the appellees shifted the Overhead into the I-35W project, this statement is a mere conclusion, unaided by any apparent preliminary investigation. Since there is no showing as to how the appellees arrived at that conclusion, the administrative record must be viewed as incomplete, unreviewable, and incapable of supporting that statement. See, e.g., Maryland-National Capital Park, 487 F.2d at 1038.
 
 
 [15]
 The author of the letter also testified that he was "shocked" upon learning that the Overhead had been included in the I-35 project and that he felt the SDHPT had misled him into giving historic preservation clearance for the Overhead expansion
 
 
 [16]
 Sometime after the FHWA approved and issued the Final Negative Declaration, the Post Office and Public Market buildings officially were determined to be eligible for inclusion on the National Register
 
 
 [17]
 The district court concluded, and the appellees argue in this appeal, that at the time the appellees made the initial decision to prosecute the I-35W project with a Negative Declaration rather than an EIS (i.e. March 1978), the decision was reasonable and must be sustained because the appellees had no reason to suspect that the I-35W project would have any significant environmental effects. The appellees then urge us to examine the administrative record as of March 1978 to sustain their conclusion that the expanded Overhead would have insignificant environmental consequences. In essence, the appellees would have us ignore that the Texas & Pacific complexes were added to the National Register or that the other two buildings were eligible for inclusion on the Register after they had decided that the I-35W project could be processed with a Negative Declaration but before they released the Draft Declaration in November 1978
 This is a difficult argument to follow because, in fact, the records, administrative and judicial, are bereft of absolutely any evidence to suggest that in March 1978 the appellees considered the Overhead to be in the I-35W project. It is quite clear that the appellees did not shift the Overhead into the I-35W project until after they had prepared the Draft Declaration. Thus, if we were to judge solely as of March 1978 the reasonableness of the appellees' decision not to prepare an EIS for the I-35W project, we would be compelled to conclude that that decision was unreasonable because no consideration had been given to the environmental effects of the Overhead expansion at that time. Even the severely criticized, single noise study had not been conducted until nearly one year later, in February or March 1979. An agency's decision of this nature cannot be sustained where it has made no effort to ascertain the environmental effects of a proposed project.
 It is in the appellees' best interest, therefore, to assume that they were not committed to the Overhead expansion plans until April 1979, when the Negative Environmental Declaration gained final FHWA approval. We have viewed the administrative record as of that date. Any "modified" plans the appellees offered after that date, see supra n. 2, however, simply cannot constitute part of the reviewable administrative record.
 
 
 [18]
 We note parenthetically that the teaching of Hiram Clarke and Asarco is not a two-way street and does not apply to the agency that either knowingly or negligently failed to prepare an adequate and reviewable administrative record. We find three separate but related reasons supporting this conclusion. First, a plaintiff who demonstrates that the agency developed an inadequate record should be afforded an opportunity, in essence, to develop that record. Second, if this were not the rule, an agency would have little incentive to prepare an adequate and reviewable administrative record, despite the clear mandate of NEPA that the agency prepare the required record before deciding upon a particular course of conduct. Finally, if the agency knew that it could always "supplement" or "create" the administrative record in the reviewing court, it actually would have an incentive to prepare an inadequate administrative record, and benefit by the lack of obstacles (from its viewpoint) frequently created by informed public participation in the decisionmaking processes
 
 
 [19]
 In upholding as reasonable the appellees' decision not to prepare an EIS, the district court in the case before us relied upon the following language from our opinion in Sierra Club v. Hassell:
 A reviewing court is to review the administrative records as well as other evidence to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agencies engaged in this analysis and reasonably concluded on the basis of their findings that an impact statement was not required, their determinations will be upheld.
 636 F.2d at 1097-98. Sierra Club v. Hassell, however, provides no guidance as to how the reviewing court is to "determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project." The generalized statement in Hassell, upon which the district court relied, therefore, is somewhat hollow, since it merely identifies the district court's basic task. The "may" analysis as initially set forth in Save Our Ten Acres, which was decided eight years before Hassell and reaffirmed most recently in Lee, is the proper method of "determin[ing] whether the agencies adequately considered ... the potential environmental effects of the project." Since the district court failed to engage in this analysis, however, we decline to accept its conclusion on the reasonableness issue.
 
 
 [20]
 Since the reviewing court need not determine the extent to which the proposed project affects all environmentally-sensitive properties, interests, and areas but merely whether the project may affect significantly some human environmental factors, our conclusion that the planned expansion may affect more than minimally the environmental factors related to the Water Garden renders unnecessary an analysis of the similar question for the historic properties. The EIS the appellees must prepare must account for these properties as well as the Water Garden
 
 
 [21]
 See, e.g., 23 C.F.R. Sec. 771.5(b) (1978) ("In the development of the highway section, the negative declaration or EIS and section 4(f) statements ... shall be completed during the location stage, prior to the selection of a particular location.")
 
 
 [22]
 By the time the appellees prepared the section 4(f) report, the Post Office and Public Market buildings officially had been determined to be eligible for inclusion on the National Register of Historic Places
 
 
 [23]
 See Louisiana Envtl. Soc'y, Inc. v. Coleman, 537 F.2d 79, 84 & 85 (5th Cir.1976) (stating that "[a]ny ... use, regardless of degree, invokes Sec. 4(f)" and commenting favorably on cases from other circuits that have adopted the constructive use doctrine); see also Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir.1982) (highway project adjacent to park constitutes "use" of the park); Monroe County Cons'n Council v. Adams, 566 F.2d 419, 424 (2d Cir.1977) (proposed highway that would reduce access to park and the use of which would create noise within park would constitute a "use" of the park within the meaning of Sec. 4(f)), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 439 (9th Cir.) (construction of six-lane controlled access highway passing within 100-200 feet of petroglyph rock designated for inclusion in National Register of Historic Places would "use" historic sites), cert. denied, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976); Brooks v. Volpe, 460 F.2d 1193, 1194 (9th Cir.1972) (interstate highway that would encircle a campground would be a constructive use); Conservation Soc'y of S.Vt., Inc. v. Secretary of Transp., 362 F.Supp. 627, 639 (D.Vt.1973) (highway that would run along border of wilderness area would use that area constructively), aff'd, 508 F.2d 927 (2d Cir.1974), vacated and remanded on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); but see Sierra Club v. DOT, 753 F.2d 120, 130 (D.C.Cir.1985) (no constructive use where commercial jet flights at airport would decrease overall noise levels, because of fewer flights, and have an inappreciable visual impact)
 
 
 [24]
 The district court also concluded that diagrams and models displayed at some public and private informational, non-section 128 hearings conducted before the February 7, 1979 hearing adequately informed the public of the explicit boundaries of the I-35W project. I-CARE, 586 F.Supp. at 1105, 1106 & 1107. Although we disagree with that factual conclusion, we also find it irrelevant. Facts, messages, or other information conveyed at hearings referred to as informal and merely informational and conducted "preparatory to formal public hearing procedures" on the projects simply cannot substitute for the notice and hearing requirements of section 128